**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SAM WELBEL, MICHAEL ARCHER, and DYLAN MACALUSO, individually and on behalf of all others similarly situated, | Case No. 1:24-cv-6426 |
| Plaintiffs, | Hon. Thomas M. Durkin |
| v. | |
| SHOUT! FACTORY, LLC, | |
| Defendant. | |

## DECLARATION OF JEREMIAH W. NIXON IN SUPPORT OF PLAINTIFFS' MOTION TO APPOINT INTERIM CLASS COUNSEL

I, Jeremiah W. Nixon, declare as follows:

1. I am a member in good standing of the Missouri Bar and Illinois Bars, and the United States District Courts of the Northern District of Illinois, the Southern District of Illinois, the Eastern District of Missouri, the District of Colorado, and the Eastern District of Michigan. I am also admitted to practice before the United States Courts of Appeals for the Eighth and Eleventh Circuits.

2. I am an attorney at The Simon Law Firm, P.C., and make this declaration in support of Plaintiffs' motion to appoint The Simon Law Firm, P.C., and Hedin LLP as interim class counsel in the above-styled class action lawsuit.

3. My firm filed the initial complaint in this lawsuit on July 25, 2024. *See* ECF No. 1. Frank Hedin and Hedin LLP filed a similar lawsuit on August 20, 2024; that case is styled *Archer et al. v. Shout! Factory, LLC*, 2:24-cv-07056 (C.D. Cal), and the complaint is attached hereto as Exhibit A.

1

4.     Frank Hedin contacted my firm, and together we have decided to coordinate our efforts on behalf of the putative class. I believe that our two firms' combined knowledge, experience, and resources will foster effective and efficient advocacy on behalf of the putative class.

5.     Recently, I became aware of a case filed on October 2, 2024, in the Northern District of Illinois that is styled *McGrath v. Shout! Factory, LLC*, 1:24-cv-09360 (N.D. Ill.) ("*McGrath*"). A copy of that complaint, retrieved from the PACER system, is attached hereto as Exhibit B.

6.     Counsel in the *McGrath* matter is listed as Matthew T. Peterson of the law firm Consumer Law Advocate, PLLC. To date, the Consumer Law Advocate, PLLC firm has not once contacted Plaintiffs' counsel of record in this above captioned action. As a courtesy, my firm will send file-stamped copies of the Plaintiffs' motion to appoint the Simon and Hedin firms as interim class counsel to the email address listed for counsel in the *McGrath* matter.

7.     Prior to filing this motion for appointment on behalf of Plaintiffs and the putative class, The Simon Law Firm conducted a significant investigation into the claims alleged by Plaintiff on behalf of himself and the class by communicating with Mr. Welbel and other potential class representatives on numerous occasions, researched online trackers—including learning how pixels and other trackers operate, uncovering trackers in website source code, and researching ways to identify what information is being tracked and transmitted, evaluated Shout! Factory, LLC's likely defenses based on extensive factual and legal research, engaged in settlement discussions with counsel for Shout! Factory, LLC, researched and analyzed data related to class damages, and researched and drafted court filings and anticipated court filings.

My colleagues and I have also conducted extensive legal research and analysis into every aspect of this case, spending significant time preparing for arguments on behalf of the class.

8.      My law firm will commit all resources necessary—financial, professional, and otherwise—in overseeing the administration of this instant class litigation and protecting the best interests of the putative class.

9.      The Simon Law Firm has, and continues to, represent plaintiffs in class actions and other complex litigation in state and federal courts nationwide. The Simon Law Firm has a roster of attorneys with a depth of experience in complex litigation, including class actions asserting VPPA claims. *See* Firm Resume, attached as Exhibit C. Further information about The Simon Law Firm is available at https://simonlawpc.com/.

10.      The Simon Law Firm also has extensive trial experience. In the past thirteen months alone, it has served as lead counsel in three jury trials that resulted in significant nine-figure verdicts. *See* Ex. C.

11.      Before joining The Simon Law Firm, I practiced law in Chicago, Illinois, where I represented plaintiffs in various class actions—including privacy class actions. While practicing out of an office in Chicago, most of my work consisted of litigation in the United States District Court for the Northern District of Illinois. I am familiar with the practices and procedures of this District.

12.      I am often in Chicago, and I am ready, willing, and able to appear in person in the Northern District whenever necessary, including on short notice.

13.      Supporting the attorneys at The Simon Law Firm is a full roster of trained professionals, paralegals, and other office staff who are willing and able to help the firm secure the best outcome for the putative class.

14.     The Simon Law Firm has experience before the Northern District of Illinois and the Federal Courts of Appeals and is fully committed to representing the class in appellate proceedings if necessary.

15.     I have no interests adverse to the putative class and The Simon Law Firm, P.C., is well suited to continue representing the Plaintiffs and members of the proposed Class in this matter.

I declare under penalty of perjury under the laws of the United States that the following is true and correct.

Executed on October 29, 2024

*/s/ Jeremiah W. Nixon*
Jeremiah W. Nixon

4

# EXHIBIT A

Frank S. Hedin (SBN 291289)
Hedin LLP
535 Mission Street, 14th Floor
San Francisco, CA 94105
Telephone: (305) 357-2107
Facsimile: (305) 200-8801
E-Mail:     fhedin@hedinllp.com

*Attorney for Plaintiffs and the Putative Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL ARCHER and DYLAN MACALUSO, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SHOUT! FACTORY, LLC<br><br>Defendant. | Case No.     2:24-cv-7056<br><br>**CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL**<br><br>**ACTION SEEKING NATIONWIDE RELIEF** |

Plaintiff Michael Archer ("Plaintiff Archer") and Plaintiff Dylan Macaluso ("Plaintiff Macaluso") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, make the following allegations pursuant to the investigation of counsel and based upon information and

belief, except as to allegations pertaining specifically to themselves or their counsel, which are based on personal knowledge.

## NATURE OF THE CASE

1. Plaintiffs bring this action for legal and equitable remedies to redress and put a stop to Defendant Shout! Factory, LLC's practices of knowingly selling, transmitting, and/or otherwise disclosing, to various third parties, records containing the personal information of each of their customers, along with detailed information revealing the titles and subject matter of the videos and other audiovisual materials purchased by each customer (collectively "Personal Viewing Information") in violation of the Video Privacy Protection Act, 18 U.S.C. §2701et. seq. ("VPPA").

2. Over the past two years, Defendant has systematically transmitted (and continues to transmit today) its customers' Personal Viewing Information to Meta using a snippet of programming code called the "Meta Pixel," which Defendant chose to install on its shoutfactory.com and other websites.

3. The information Defendant disclosed (and continues to disclose) to Meta, via the Meta Pixel it installed on its websites, includes the customer's Facebook ID ("FID") coupled with the title of each of the specific

videos that the customer purchased on Defendant's websites. A customer's FID is a unique sequence of numbers linked to the Meta profile belonging to that customer. The customer's Meta profile, in turn, publicly identifies the customer by name (and contains other personally identifying information about the customer as well). Entering "facebook.com/[FID]" into a web browser returns the Meta profile of the person to whom the FID corresponds. Thus, the FID identifies a person more precisely than a name, as numerous persons may share the same name but each person's Facebook profile (and associated FID) uniquely identifies one and only one person. In the simplest terms, the Meta Pixel installed by Defendant captures and discloses to Meta information that reveals the specific videos that a particular person purchased from Defendant's websites (hereinafter, "Private Viewing Information").

4. Defendant disclosed and continues to disclose its customers' Private Viewing Information to Meta without asking for let alone obtaining its customers' consent to these practices.

5. The VPPA clearly prohibits what Defendant has done. Subsection (b)(1) of the VPPA provides that, absent the consumer's prior informed, written consent, any "video tape service provider who knowingly

discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person for," 18 U.S.C. § 2710(b)(1), *inter alia*, liquidated damages in the amount of $2,500.00 per violation and equitable relief, *see id.* § 2710(c).

6.      Accordingly, on behalf of themselves and the putative Class members defined below, Plaintiffs bring this Class Action Complaint against Defendant for intentionally and unlawfully disclosing their Personal Viewing Information to Meta.

## PARTIES

### I.      Plaintiff Archer

7.      Plaintiff Archer is, and at all times relevant hereto was, a citizen and resident of Metairie, Louisiana.

8.      Plaintiff Archer is, and at all times relevant hereto was, a user of Meta.

9.      On or about May 7, 2024, Plaintiff Archer purchased prerecorded video material from Defendant by requesting and paying for such material on Defendant's website, www.shoutfactory.com, and by providing his name, email address, and home address for shipment of such material.   Accordingly, Plaintiff Archer requested or obtained, and is

CLASS ACTION COMPLAINT

therefore a consumer of, prerecorded video material sold by Defendant on its website.

10.   At all times relevant hereto, including when purchasing prerecorded video material from Defendant on its website, Plaintiff Archer had a Meta account, a Meta profile, and an FID associated with such profile.

11.   When Plaintiff Archer purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta Plaintiff Archer's FID coupled with the specific title of the video he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Archer and the device on which he used to make the purchase.

12.   Plaintiff Archer has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Meta. In fact, Defendant never even provided Plaintiff Archer with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties such as Meta.

13.   Because Defendant disclosed Plaintiff Archer's Private Viewing Information (including his FID, the title of the prerecorded video material he purchased from Defendant's website, and the URL where such video is

available for purchase) to Meta during the applicable statutory period, Defendant violated Plaintiff Archer's rights under the VPPA and invaded his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

## II.    Plaintiff Macaluso

14.    Plaintiff Macaluso is, and at all times relevant hereto was, a citizen and resident of Cleveland, Ohio.

15.    Plaintiff Macaluso is, and at all times relevant hereto was, a user of Meta.

16.    On or about March 4, 2024, Plaintiff Macaluso purchased prerecorded video material from Defendant by requesting and paying for such material on Defendant's website, www.shoutfactory.com, and by providing his name, email address, and home address for shipment of such material.   Accordingly, Plaintiff Macaluso requested or obtained, and is therefore a consumer of, prerecorded video material sold by Defendant on its website.

17.    At all times relevant hereto, including when purchasing prerecorded video material from Defendant on its website, Plaintiff Macaluso had a Meta account, a Meta profile, and an FID associated with

such profile.

18.     When Plaintiff Macaluso purchased prerecorded video material from Defendant on its website, Defendant disclosed to Meta Plaintiff Macaluso's FID coupled with the specific title of the video he purchased (as well as the URL where such video is available for purchase), among other information concerning Plaintiff Macaluso and the device on which he used to make the purchase.

19.     Plaintiff Macaluso has never consented, agreed, authorized, or otherwise permitted Defendant to disclose his Personal Viewing Information to Meta.  In fact, Defendant never even provided Plaintiff Macaluso with written notice of its practices of disclosing its customers' Personal Viewing Information to third parties such as Meta.

20.     Because Defendant disclosed Plaintiff Macaluso's Private Viewing Information (including his FID, the title of the prerecorded video material he purchased from Defendant's website, and the URL where such video is available for purchase) to Meta during the applicable statutory period, Defendant violated Plaintiff Macaluso's rights under the VPPA and invaded his statutorily conferred interest in keeping such information (which bears on his personal affairs and concerns) private.

CLASS ACTION COMPLAINT

## III. Defendant Shout! Factory, LLC

21. Defendant is a Delaware limited liability company with its headquarters and principal place of business located at 1640 S. Sepulveda Blvd., Suite 400, Los Angeles, CA 90025.

22. Defendant operates and maintains the websites www.shoutfactory.com and www.ghiblicollection.com, among others, where it is engaged in the business of selling, *inter alia*, a wide variety of movies, television shows, and other prerecorded video materials to consumers.

## JURISDICTION AND VENUE

23. This Court has subject-matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 2710.

24. Personal jurisdiction and venue are proper because Defendant maintains its headquarters and principal place of business in Los Angeles, CA, within this judicial District.

## VIDEO PRIVACY PROTECTION ACT

25. Generally speaking, the VPPA prohibits companies like Defendant from knowingly disclosing to third parties like Meta information that personally identifies consumers like Plaintiffs as having viewed particular videos or other audio-visual products or services.

26.    Specifically, subject to certain exceptions that do not apply here, the VPPA prohibits "a video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider[.]" 18 U.S.C. § 2710(b)(1). The statute defines a "video tape service provider" as "any person, engaged in the business…of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), and defines a "consumer" as "a renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). "'[P]ersonally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3)

27.    The VPPA's purpose is as apropos today as it was at the time of its enactment over 35 years ago. Leading up to the statute's enactment in 1988, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other

CLASS ACTION COMPLAINT

audiovisual materials, because such records offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

28.     Thus, in proposing the Video and Library Privacy Protection Act (which later became the VPPA), Senator Patrick J. Leahy (the senior Senator from Vermont from 1975 to 2023) sought to codify, as a matter of law, that "our right to privacy protects the choice of movies that we watch with our family in our own homes." 134 Cong. Rec. S5399 (May 10, 1988). As Senator Leahy explained at the time, it is the personal nature of such information, and the need to protect it from disclosure, that is the raison d'être of the statute: "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people." *Id.*

29.    While these statements rang true in 1988 when the act was passed, the importance of legislation like the VPPA in the modern era of data mining is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

30.    Former Senator Al Franken may have said it best: "If someone wants to share what they watch, I want them to be able to do so . . . But I want to make sure that consumers have the right to easily control who finds out what they watch—and who doesn't. The Video Privacy Protection Act guarantees them that right."[2]

---

[1]    The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, http://www.judiciary. senate.gov/meetings/the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21stcentury.

[2]    Chairman Franken Holds Hearing on Updated Video Privacy Law for 21st Century, frank.senate.gov (Jan. 31, 2012).

31. In this case, however, Defendant deprived Plaintiffs and the unnamed Class members of that right by systematically (and surreptitiously) disclosing their Personal Viewing Information to Meta, without providing notice to (let alone obtaining consent from) any of them, as explained in detail below.

## BACKGROUND FACTS

### I. Consumers' Personal Information Has Real Market Value

32. In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[3]

33. More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace

---

[3] FCC, *The Information Marketplace* (Mar. 13, 2001), at 8-11, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.

CLASS ACTION COMPLAINT

that supports a $26 billion dollar per year online advertising industry in the United States.[4]

34.    The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[5]

35.    In fact, an entire industry exists while companies known as data aggregators purchase, trade, and collect massive databases of information about consumers.    Data aggregators then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[6]

---

[4]    *See Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

[5]    Statement of FTC Cmr. Harbour (Dec. 7, 2009), at 2, *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf.

[6]    *See* M. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

36.     The scope of data aggregators' knowledge about consumers is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[7]

37.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[8]

38.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data, stating in pertinent part:

> By combining data from numerous offline and online sources, data brokers have developed hidden

---

[7]     N. Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html.

[8]     Letter from Sen. J. Rockefeller IV, Sen. Cmtee. on Commerce, Science, and Transportation, to S. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c.

dossiers on every U.S. consumer. This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

39.     Data aggregation is especially troublesome when consumer information is sold to direct-mail advertisers. In addition to causing waste and inconvenience, direct-mail advertisers often use consumer information to lure unsuspecting consumers into various scams,[10] including fraudulent sweepstakes, charities, and buying clubs. Thus, when companies like Shout! Factory, LLC  share information with data aggregators, data cooperatives, and direct-mail advertisers, they contribute to the "[v]ast databases" of consumer data that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

40.     Disclosures like Defendant's are particularly dangerous to the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are

---

[9]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Sen. Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[10] *See Prize Scams*, Federal Trade Commission http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 30, 2021).

[11] *See* Charles Duhigg, *Bilking the Elderly, with a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html (last visited July 30, 2021).

CLASS ACTION COMPLAINT

lonely for the companionship that telephone callers provide."[12]  The FTC notes that "[t]she elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

41.    Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.    Thus, information disclosures like Defendant's are particularly troublesome because of their cascading nature:  "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

42.    Defendant is not alone in violating its customers' statutory rights and jeopardizing their well-being in exchange for increased revenue: disclosing customer and subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties has become a widespread practice.  Unfortunately for consumers, however, this growth has come at the expense of their most basic privacy rights.

---

[12]    *Id.*

[13]    *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf.

[14]    *Id.*

## II.  Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

43.  As the data aggregation industry has grown, so too have consumer concerns regarding their personal information.

44.  A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

45.  Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

---

[15]  *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf.

[16]  *Id.*

46. In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[17]

47. These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

48. Thus, in today's digital economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19] As such, where a business offers customers a service that

---

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html.

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy.

[19] *See* Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf ("It is obvious that people value online privacy.").

CLASS ACTION COMPLAINT

includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### III. Defendant Uses the Meta Pixel to Systematically Disclose its Customers' Personal Viewing Information to Meta

49. As alleged below, when a customer of any of Defendant's websites purchases a specific video, the Meta Pixel technology that Defendant intentionally installed on its websites transmits the customer's personally identifying information and detailed information concerning the specific interactions the customer takes on its websites (including the customer's Private Viewing Information revealing the specific videos that he or she purchased) to Meta, without the customer's consent and in clear violation of the VPPA.

### A. The Meta Pixel

50. On February 4, 2004, Mark Zuckerberg and others launched Facebook, now known as "Meta".[20] Since then, Meta has become the world's largest social media platform. To create a Meta account, a person must provide, *inter alia*, his or her first and last name, birthdate, gender, and phone number or email.

---

[20] Company Info, FACEBOOK, https://about.fb.com/company-info

19

51.     The Meta Pixel, first introduced in 2013 as the "Facebook Pixel," is a unique string of code that companies can embed on their websites to allow them to track consumers' actions and report the actions back to Meta.

52.     The Meta Pixel allows online-based companies like Defendant to build detailed profiles about their visitors by collecting information about how they interact with their websites, and to then use the collected information to service highly targeted advertising to them.

53.     Additionally, a Meta Pixel installed on a company's website allows Meta "to match . . . website visitors to their respective [Meta] User accounts."[21] Meta is able to do this because it has assigned to each of its users an "FID" number – a unique and persistent identifier that allows anyone to look up the user's unique Meta profile and thus identify the user by name[22] – and because each transmission of information made from a company's website to Meta via the Meta Pixel is accompanied by, *inter alia*, the FID of the website's visitor. Moreover, the Meta Pixel can follow a

---

[21]     https://developers.facebook.com/docs/meta-pixel/get-started.

[22]     For example, Mark Zuckerberg's FID is reportedly the number "4," so logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck, and all of the additional personally identifiable information contained therein.

consumer to different websites and across the Internet even after clearing browser history.

54. Meta has used the Meta Pixel to amass a vast digital database of dossiers comprised of highly detailed personally identifying information about each of its billions of users worldwide, including information about all of its users' interactions with any of the millions of websites across the Internet on which the Meta Pixel is installed. Meta then monetizes this Orwellian database by selling advertisers the ability to serve highly targeted advertisements to the persons whose personal information is contained within it.

55. Simply put: if a company chooses to install the Meta Pixel on its website, both the company who installed it and Meta (the recipient of the information it transmits) are then able to "track[] the people and type of actions they take"[23] on the company's website, including the purchases they made, the items they spent time viewing, and, as relevant here, the specific video content that they purchased on the website.

**B. Defendant Knowingly Uses the Meta Pixel to Transmit the**

---

[23] https://www.facebook.com/business/goals/retargeting.

**Private Viewing Information of its Customers to Meta**

56.   To purchase video products from Defendant's websites, the consumer must provide at least his or her name, email address, billing address, and credit- or debit card (or other form of payment) information.

57.   After a person has completed the order process on Defendant's websites, Defendant uses – and has used at all times relevant hereto – the Meta Pixel to disclose to Meta the unencrypted FID of the customer and the specific videos that he or she purchased  from Defendant's websites.

58.   Defendant intentionally programmed its websites (by following step-by-step instructions from Meta's website) to include a Meta Pixel that systematically transmits to Meta the FIDs of its customers and the video products that each of them requested in order to take advantage of the targeted advertising and other informational and analytical services offered by Meta.

59.   With only a person's FID and the video content name or URL that the person requested on Defendant's websites—all of which Defendant knowingly provides to Meta —any ordinary person could learn the identity of the person to whom the FID corresponds and the specific video products or services that this person requested.  This can be accomplished simply by

accessing the URL www.facebook.com/[unencrypted FID/.

60. Defendant's practices of disclosing the Private Viewing Information of its customers to Meta continued unabated for the full duration of the time period relevant to this action. At all times relevant hereto, whenever Plaintiffs or another customer of Defendant's websites purchased a particular video from Defendant's websites, Defendant disclosed to Meta that (*inter alia*) the specific video that was purchased (including the URL where such video was purchased), along with the FID of the customer who requested it (which, as discussed above, uniquely identifies the person).

61. At all relevant times, Defendant knew that the Meta Pixel disclosed its customers Private Viewing Information to Meta.

62. Defendant could easily have programmed its websites so that none of its customers' detailed Private Viewing Information is disclosed to Meta. Instead, Defendant chose to program its websites so that all of its customers' detailed Private Viewing Information is sent to Meta *en masse*.

63. Prior to transmitting its customers' Private Viewing Information to Meta, Defendant failed to notify Plaintiffs or any of its other customers that it would do so, and neither Plaintiffs nor any of its other

customers have consented (in writing or otherwise) to these practices.

64.     By intentionally disclosing to Meta Plaintiffs' and its other customers' FIDs together with the specific video content they each purchased, without Plaintiffs' or any of its other customers' consent to these practices, Defendant knowingly and systematically violated the VPPA on an enormous scale.

## CLASS ACTION ALLEGATIONS

65.     Plaintiffs seeks to represent a class defined as all persons in the United States who, during the two years preceding the filing of this action, purchased video content from Defendant's websites as a consumer of Defendant's websites and while maintaining an account with Meta Platforms, Inc. f/k/a Facebook, Inc.

66.     Class members are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in at least the tens of thousands.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the membership records of Defendant.

67.     Common questions of law and fact exist for all Class members and predominate over questions affecting only individual class members. Common legal and factual questions include, but are not limited to: (a) whether Defendant knowingly disclosed Plaintiffs' and Class members' Private Viewing Information to Meta;  (b) whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710; (c) whether Defendant should be enjoined from disclosing Plaintiffs' and Class members' Private Viewing Information to Meta; and (d) whether Plaintiffs and Class members are entitled to statutory damages for the aforementioned violations.

68.     The named Plaintiffs' claims are typical of the claims of the Class in that the named Plaintiffs and the Class members suffered invasions of their statutorily protected right to privacy (as afforded by the VPPA), as well as intrusions upon their private affairs and concerns that would be highly offensive to a reasonable person, as a result of Defendant's uniform and wrongful conduct in intentionally disclosing their Private Purchase Information to Meta.

69.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they

CLASS ACTION COMPLAINT

seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of Class members.

70.     The class mechanism is superior to other available means for the fair and efficient adjudication of Class members' claims. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by this case's complex legal and factual issues. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSE OF ACTION
## Violation of the Video Privacy Protection Act, 18 U.S.C. § 2710

71. Plaintiffs repeat the allegations asserted in the preceding paragraphs as if fully set forth herein.

72. Plaintiffs bring their claims individually and on behalf of the putative Class Members against Defendant.

73. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifying information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

74. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials[.]" Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it is engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

75. As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or consumer of goods or services from a video tape service

provider." As alleged above, Plaintiffs and Class members are consumers to Defendant's service of providing video content. Thus, Plaintiffs and Class members are "consumers" under this definition.

76.    As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

77.    Defendant knowingly disclosed Plaintiffs' and Class members' Private Viewing Information to Meta in the manner alleged herein.

78.    The Private Viewing Information that Defendant transmitted to Meta constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiffs and each Class member to Meta as an individual who purchased video content, including the specific video materials purchased from Defendant's websites.

79.    Defendant never obtained informed, written consent from Plaintiffs or any Class member to disclose their Private Viewing Information to Meta or any other third party. More specifically, Defendant never obtained from Plaintiffs or any Class member informed, written consent in a form distinct and separate from any form setting forth other

legal or financial obligations of the consumer; Defendant never obtained from Plaintiffs or any Class member informed, written consent that, at the election of the consumer, was given at the time the disclosure is sought or was given in advance for a set period of time, not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner; and Defendant never provided an opportunity, in a clear and conspicuous manner, for Plaintiffs or any Class member to withdraw consent on a case-by-case basis or to withdraw consent from ongoing disclosures, at the consumer's election. *See* 18 U.S.C. § 2710(b)(2).

80. Defendant knowingly disclosed such information to Meta because Defendant intentionally installed and programmed the Meta Pixel code on its website, knowing that such code would transmit to Meta the video titles requested by its customers and its customers' unique identifiers (including FIDs) when customers purchased videos from its website.

81. By disclosing Plaintiffs' and Class members' Private Viewing Information, Defendant violated their statutorily protected right to privacy in the videos they purchased from Defendant. 18 U.S.C. § 2710(c).

82. As a result of these violations, Defendant is liable to Plaintiffs and Class members for damages and other relief as provided by the VPPA.

83. On behalf of themselves and all members of the Class, Plaintiffs seek to enjoin Defendant's future disclosures of its customers' Private Viewing Information; liquidated damages in the amount of $2,500 per violation of the VPPA; reasonable attorneys' fees and costs; and all other preliminary or equitable relief the Court deems appropriate. 18 U.S.C. § 2710(c)(2)(A).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks a judgment against Defendant Shout! Factory LLC as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

B. For an order declaring that Defendant's conduct as described herein violated the VPPA;

C. For an order finding in favor of Plaintiffs and the Class and against Defendant on all counts asserted herein;

D. For an award of $2,500.00 to the Plaintiffs and each Class member, as provided by the VPPA, 18 U.S.C. § 2710(c);

E.     For an order permanently enjoining Defendant from disclosing the Private Viewing Information of its customers to third parties in violation of the VPPA.

F.     For prejudgment interest on all amounts awarded; and

G.     For an order awarding punitive damages, reasonable attorneys' fees, and costs to counsel for Plaintiffs and the Class under Rule 23 and 18 U.S.C. § 2710(c).

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action and issues so triable.

Dated: August 20, 2024               Respectfully submitted,


                                     /s/ Frank S. Hedin

                                     **HEDIN LLP**
                                     FRANK S. HEDIN
                                     535 Mission Street, 14th Floor
                                     San Francisco, CA 94105
                                     TELEPHONE:      (305) 357-2107
                                     FACSIMILE: (305) 200-8801
                                     FHEDIN@HEDINLLP.COM

                                     *Counsel for Plaintiff and Putative Class*

31

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PATRICK MCGRATH, individually and on behalf of others similarly situated, | |
| Plaintiff, | Civil Action Case No. |
| v. | |
| Shout! Factory, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff, Patrick McGrath ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his undersigned counsel, brings this class action against Defendant, Shout! Factory, LLC (hereinafter "Defendant"), and alleges as follows:

## INTRODUCTION

1.       Plaintiff, Patrick McGrath, brings this Class Action Complaint against Defendant Shout! Factory, LLC ("Defendant"), on his own behalf and on behalf of other similarly situated individuals, to obtain relief for Defendant's knowing disclosure of their personally identifiable information ("PII") and prerecorded DVD viewing activity to third parties in violation of the Video Privacy Protection Act ("VPPA"), Specifically, Defendant uses third-party code to track prerecorded DVDs its customers purchase and sends that data to its third-party code vendors along with customers' PII, all without its customers' valid consent. Plaintiff alleges as follows based on Plaintiff's own personal knowledge, acts, and experiences, and as to all other matters, on information and belief, including an investigation by his attorneys.

## NATURE OF THE ACTION

2.      Defendant is an entertainment company that specializes in selling classic and cult films, television shows, and animation in DVD format on its website https://shoutfactory.com.

3.      In addition, Defendant has knowingly installed pixels and other tracking technologies on its website developed by third party advertisers. These tracking technologies capture the PII of Defendant's customers relating to specific videos that Defendant's customers have purchased and disclose such PII to the third-party developers, all without the customers' informed, written consent.

4.      In direct contravention of the protections afforded by the VPPA, Defendant discloses to third-party companies its customers' PII without first obtaining their written consent. Accordingly, Plaintiff brings this action on behalf of himself and other of Defendant's customers who purchased a DVD and whose PII Defendant unlawfully disclosed.

5.      Plaintiff seeks an order enjoining Defendant from further unauthorized disclosure of consumers' PII, awarding damages consistent with the VPPA, and awarding reasonable attorneys' fees and costs.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because: (1) there are 100 or more putative Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiff and Defendant are citizens of different states.

7.      This Court may assert personal jurisdiction over Defendant because Plaintiff's cause of action arises out of Defendant's contacts with the state of Illinois. Defendant has

purposefully availed itself of the Illinois marketplace and knowingly placed its DVDs in the Illinois marketplace in an effort to transact business with Illinois residents.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

9.     Plaintiff is a resident and citizens of Illinois.

10.    Defendant is a Delaware limited liability company with its principal place of business in California.

## FACTUAL ALLEGATIONS

11.    The genesis of the VPPA was President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store shared Judge Bork's rental history with the Washington City Paper, which then published it. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who sponsored the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12.     The VPPA generally prohibits the knowing disclosure of information which identifies a consumer as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(b)(1).

13.     Defendant owns and operates shoutfactory.com, where it sells DVDs to its customers and then ships the DVDs to the customers.

14.     Defendant has also knowingly deployed third-party tracking pixels and other third-party tracking technologies on its shoutfactory.com webpage. Such tracking technology sends customer activity information to third parties, specifically, Meta Platforms, Inc. ("Meta").

15.     Defendant programmed such third-party tracking technology into its website for advertising purposes and to increase its profits. Defendant knew that such tracking technology would transmit its customers' activity, including records of which DVDs Defendant's customers purchased, as the entire purpose of implementing such technology is so that Defendant can target advertisements or send marketing emails through the technology's third-party providers.

16.     When a customer of Defendant purchases a DVD on its website, Defendant, through the third-party tracking technologies, knowingly incorporates into its webpages, discloses such customers' PII, including emails, and/or IDs associated with Defendant's third-party technology vendors, along with records of the DVD the customer purchased to its third-party tracking vendors.

17.     For example, when a customer who is a Facebook user purchases a DVD on Defendant's website, Meta's "Meta Pixel," a tracking technology programmed into Defendant's website code, transmits that information to Facebook along with the customer's Facebook ID. The Facebook ID is a unique identifier assigned to each Facebook user. Typing

4

www.facebook.com/[customer's Facebook ID] into a web browser permits anyone to find that customer's Facebook account. A Facebook account generally contains a wide range of demographic information about a Facebook user.

18.     At no time, however, does Defendant inform its customers that records of their DVD purchase activity and PII will be shared with such third parties "in a form distinct and separate from any form setting forth other legal or financial obligations" of the customer, as VPPA requires. Nor does Defendant seek or obtain customers' informed, written consent to those disclosures.

## PLAINTIFF'S EXPERIENCE

19.     In or around 2024, Plaintiff purchased a DVD on Defendant's website.

20.     At all relevant times, Plaintiff has been a Facebook user.

21.     While Plaintiff purchased a DVD from Defendant's website, Plaintiff Defendant disclosed to third-party tracking vendors, including Meta, records of which specific DVD Plaintiff purchased as well as Plaintiff's PII in the form of his email address (which includes his last name), and Facebook ID.

22.     Plaintiff has never given his consent, written or otherwise, to Defendant to disclose such information to third parties.

## CLASS ALLEGATIONS

23.     Plaintiff brings this action individually and as representatives of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following defined Classes:

**NATIONAL CLASS:** All persons in the United States who purchased DVDs from Defendant and whose personally identifiable information was disclosed by Defendant to any third party during the class period. ("Class")

**ILLINOIS SUBCLASS**: All persons in the State of Illinois who purchased DVDs from Defendant and whose personally identifiable information was disclosed by Defendant to any third party during the class period. ("Illinois Subclass")

24. Subject to additional information obtained through further investigation and discovery, the above-described Class and Illinois Subclass may be modified or narrowed as appropriate.

25. Members of the classes described above are referred to as "Class Members" or members of the "Classes."

26. The following are excluded from the Classes: (1) any judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

27. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiffs' claims can be proven on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

28. **Numerosity - Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous that individual joinder of all Class Members is impracticable. On

6

information and belief, Class Members number in the thousands. The precise number and identity of members of the Classes are presently unknown to Plaintiff but may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

29. **Commonality and Predominance - Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**. Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting individual members of the Classes. These common questions of law or fact include, but are not limited to:

     a. Whether Defendant knowingly disclosed Class members' personal video viewing information to third parties;,

     b. Whether Defendant knowingly disclosed Class members personally identifiable information to third parties;;

     c. Whether Class members are entitled to damages and equitable relief as a result of Defendant's conduct.

30. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff on behalf of the other Class Members. Similar or identical statutory violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

31. **Typicality - Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as

7

complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

32.     **Adequacy of Representation - Federal Rule of Civil Procedure 23(a)(4).**
Plaintiff is an adequate representative of the Classes because Plaintiff is a member of the Classes and Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent. Plaintiff has also retained counsel competent and experienced in complex privacy and class action litigation. Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

33.     **Superiority - Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**FRAUDULENT CONCEALMENT AND TOLLING**

34.      The applicable statutes of limitations are tolled by virtue of Defendant's knowing and active concealment of the facts alleged above. Plaintiff and members of the Classes were ignorant of the information essential to the pursuit of these claims, without any fault or lack of diligence on their own part.

35.      At the time the action was filed, Defendant was under a duty to disclose the true character, quality, and nature of its activities to Plaintiff and the Classes. Defendant is therefore estopped from relying on any statute of limitations.

36.      Defendant's fraudulent concealment is common to the Classes.

**CAUSES OF ACTION**

**COUNT I**
**Violations of the Video Privacy Protection Act, 18 U.S.C. 2710**
**On behalf of Plaintiff and the Classes**

37.      Plaintiff, on behalf of himself and all others similarly situated, repeats and re-allege paragraph 1 through 36 as if fully set forth herein.

38.      The VPPA The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710(b)(1).

39.      A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Id. § 2710(a)(4). Defendant is a "video tape service provider" because it is engaged in the business of delivering prerecorded audiovisual materials in the form

9

of DVDs that are similar to prerecorded video cassette tapes and those sales affect interstate or foreign commerce.

40.     As defined in 18 U.S.C. § 2710(a)(1), a "'consumer' means any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiff and the Class members purchased DVDs, which is prerecorded video content, from Defendant's website. Thus, Plaintiff and the Class members are "consumers" under this definition.

41.     As defined in 18 U.S.C. § 2710(a)(3), "'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

42.     Defendant knowingly disclosed Plaintiff's and the Class members' PII, including their email addresses and/or Facebook IDs or other social networking IDs, to its third-party tracking vendors.

43.     This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to Defendant's third-party vendors as an individual who requested or obtained Defendant's video content, including the specific video materials requested or obtained on Defendant's website.

44.     Under the VPPA, "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or given in advance for a set period of time not to exceed two years or until consent is withdrawn by the

10

consumer, whichever is sooner." *Id.* § 2710(b)(2)(B). Defendant failed to obtain informed, written consent from Plaintiff and the Class members under this definition.

45.      In addition, the VPPA creates an opt-out right for consumers. *Id.* §2710(2)(B)(iii). It requires video tape service providers like Defendant to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." *Id.* Defendant failed to provide an adequate opportunity to opt out as required by the VPPA.

46.      Defendant knowingly disclosed Plaintiff's and the Class members' personal viewing information to its third-party tracking vendors. Defendant programmed its third-party vendors' tracking technology into its website code, knowing that those third parties would receive records of which DVDs a customer purchased requested and the customer's PII.

47.      By disclosing Plaintiff's and the Classes' personal viewing information, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits.

48.      As a result of the above violations, Defendant is liable to Plaintiff and the other Class members for actual damages in an amount to be determined at trial or, alternatively, for "liquidated damages" "not less than $2,500" per violation. *Id.* § 2710(c)(2). Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future. *Id.*

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that the Court enter an Order:

a. Certifying this action as a class action as provided by Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as Class Representative for the Classes, and appointing the undersigned as Class Counsel for the Classes;

b. Adjudging that Defendant's conduct violates the cause of action referenced herein;

c. Finding in favor of Plaintiff and the Classes on all counts herein;

d. An award of statutory damages under the VPPA to the Classes;

e. For punitive damages, as warranted, in an amount to be determined at trial;

f. For prejudgment interest on all amounts awarded;

g. For injunctive relief enjoining Defendant's ongoing misconduct, as the Court deems appropriate; and

h. Awarding Plaintiff and the Classes their reasonable attorneys' fees and other litigation costs reasonably incurred.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a jury trial on all triable issues.

Dated: October 2, 2024                    Respectfully submitted,

*/s/ Matthew T. Peterson*
Matthew Peterson
Consumer Law Advocate, PLLC
230 E. Ohio St., Suite 410
Chicago, IL 60611
Tel: (815) 999-9130
mtp@lawsforconsumers.com
ARDC No. 6321290

12

ILND 44 (Rev. 08/23)

# CIVIL COVER SHEET

The ILND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(See instructions on next page of this form.)*

## I. (a) PLAINTIFFS
Patrick McGrath

### DEFENDANTS
Shout! Factory, LLC

**(b)** County of Residence of First Listed Plaintiff
*(Except in U.S. plaintiff cases)*

County of Residence of First Listed Defendant
*(In U.S. plaintiff cases only)*
Note: In land condemnation cases, use the location of the tract of land involved.

**(c)** Attorneys *(firm name, address, and telephone number)*
Matthew Peterson, Consumer Law Advocate, PLLC, 230 E. Ohio St., Suite 410, Chicago, IL 60611

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Check one box, only.)*

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☑ 3 Federal Question *(U.S. Government not a party.)*
- ☑ 4 Diversity *(Indicate citizenship of parties in Item III.)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(For Diversity Cases Only.)*
*(Check one box, only for plaintiff and one box for defendant.)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Check one box, only.)*

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loan (Excludes Veterans)
- ☐ 153 Recovery of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**PROPERTY RIGHTS**
- ☐ 820 Copyright
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729 (a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☑ 890 Other Statutory Actions
- ☐ 891 Agricultural Arts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 445 Amer. w/ Disabilities- Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus – Alien Detainee (Prisoner Petition)
- ☐ 465 Other Immigration Actions

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAXES**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant
- ☐ 871 IRS—Third Party 26 USC 7609

## V. ORIGIN *(Check one box, only.)*
- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District (specify)
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION ( Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)
18 U.S.C. 2710

## VII. PREVIOUS BANKRUPTCY MATTERS (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:
☑ Check if this is a **class action** under Rule 23, F.R.CV.P.

Demand $ 5,000,000

CHECK Yes only if demanded in complaint:
Jury Demand: ☑ Yes ☐ No

## IX. RELATED CASE(S) IF ANY *(See instructions):*
Judge Thomas M. Durkin
Case Number 1:24-CV-06426

## X. Is this a previously dismissed or remanded case? ☐ Yes ☐ No If yes, Case #
Name of Judge

Date: 10/2/2024

Signature of Attorney of Record

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority for Civil Cover Sheet

The ILND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**     **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use
**(b)**     **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the
**(c)**     **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**     **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here. United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box. Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.**     **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**     **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**     **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**     **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**     **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**     **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

**U.S. District Court for the Northern District Of Illinois**
**Attorney Appearance Form**

Case Title: Patrick McGrath v. Shout! Factory, LLC        Case Number: 24-cv-09360

An appearance is hereby filed by the undersigned as attorney for:

 Patrick McGrath

Attorney name (type or print): Matthew Peterson

Firm: Consumer Law Advocate, PLLC

Street address: 230 E. Ohio St., Suite 410 Chicago, IL 60611

City/State/Zip: Chicago, IL 60611

Bar ID Number: 6321290
(See item 3  in instructions)        Telephone Number: 8159999130

Email Address: mtp@lawsforconsumers.com

Are you acting as lead counsel in this case?          ☑Yes   ☐No

Are you a member of the court's general bar?          ☑Yes   ☐No

Are you a member of the court's trial bar?            ☐Yes   ☐No

Are you appearing *pro hac vice*?                     ☐Yes   ☐No

If this case reaches trial, will you act as the trial attorney?   ☑Yes   ☐No

If this is a criminal case, check your status.

☐ Retained Counsel

☐ Appointed Counsel
If appointed counsel, are you a

☐ Federal Defender

☐ CJA Panel Attorney

In order to appear before this Court an attorney must either be a member in good standing of this Court's general bar or be granted leave to appear *pro hac vice* as provided for by local rules 83.12 through 83.14. I declare under penalty of perjury that the foregoing is true and correct. Under 28 U.S.C.§1746, this statement under perjury has the same force and effect as a sworn statement made under oath.

Executed on  10/2/2023

Attorney signature:  S/ Matthew Peterson
(Use electronic signature if the appearance form is filed electronically.)

Revised  07/19/2023

# EXHIBIT C



**The Simon Law Firm, P.C.**
*Attorneys and Counselors at Law*

### SIMON LAW FIRM RESUME – CLASS ACTION AND MDL CASES

The Simon Law Firm, P.C. is recognized as a leader in class action and complex litigation, representing clients in high-stakes cases nationwide. With a dedicated team of experienced trial attorneys, we deliver exceptional legal advocacy and are committed to achieving justice for clients facing corporate misconduct, antitrust violations, privacy violations, consumer fraud, and other large-scale legal challenges. Our attorneys are well-versed in federal and state procedural requirements, regularly handling class actions and complex multi-district litigations.

The Simon Law Firm has obtained tens of millions of dollars in relief for millions of consumers, homeowners, and employees. Our attorneys have argued class action-related appeals before the Missouri Supreme Court five times since 2009. We regularly appear before state and federal appellate courts on complicated class action issues. U.S. News has ranked the Simon Law Firm as one of the "Best Law Firms" in multiple areas of litigation, including Class Actions and Mass Tort Litigation. It was also named one of the "winningest firms" in the U.S. by The National Law Journal. The Simon Law Firm has served as lead counsel in myriad class actions involving a wide range of legal matters, including the privacy statutes, the FLSA, ERISA, FDCPA, constitutional challenges, and the UDAP statutes of various states.

### NOTABLE CLASS ACTION SETTLEMENTS AND RECENT MULTIDISTRICT LITIGATION

- *Woods v. QC Financial Services Inc., d/b/a/ Quik Cash*, Case No. 12SL-CC00318 (St. Louis County Cir. Ct. Feb. 2012) ($25 million settlement obtained via class arbitration in predatory lending class action).

- *In Re: Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation*, 4:14-md-2562 ($32 million settlement in class action related to Blue Buffalo's marketing campaign misleading consumers about the nature of its pet food).

- *Bauer v. DFM Investment Co.*, No. 07CC-003756 (St. Louis County Cir. Ct. June 2011) ($3.5 million settlement in consumer fraud class action).

- *Richards v. Lou Fusz Automotive Network*, No. 08SL-CC04594 (St. Louis County Cir. Ct. Aug 2011) ($2.5 million settlement in consumer fraud class action).

- *Hooper v. Advance America,* No. 2:08-cv-4045 (Mo. W.D. Nov 2010) (predatory lending class action settlement that yield a refund of $2 million in cash, $3.8 million in debt reduction, and nearly $11 million total in overall debt relief).

- *Frazier v. Elco Chevrolet Inc.*, No. 07CC-03928 (St. Louis County Cir. Ct. June 2010) ($2.3 million settlement in consumer fraud class action).

- *Titus v. Burns & McDonnell Inc.*, No. 4:09-cv-117 (Mo. W.D. Sept. 2011) ($1.15 million settlement in ERISA class action).

800 Market Street, Suite 1700
St. Louis, Missouri 63101
Telephone 314.241.2929

www.simonlawpc.com



Toll Free 877.767.3108
Facsimile 314.241.2029

- *Jost v. Commonwealth Land Title Insurance Co.*, No. 4:08-734-CDP. (multi-state FLSA collective action settlement obtained after conditional certification granted by Judge Perry in the ED of MO).

- *In re: Unified Messaging Solutions,* MDL No. 2371 (Patent infringement related to messaging technology).

- *In re: Imprelis Herbicide Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2284 (defective herbicide that killed hundreds of thousands of trees).

- *In re: Aurora Dairy Corp. Organic Milk Marketing and Sales Practices Litigation*, MDL No. 1907 (Aurora organic milk).

- *In Re: Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, (Ford Explorer SUVs and Firestone tires).

- *Vioxx Litigation* MDL (The Simon Law Firm was responsible for prosecuting 363 separate cases against Merck. In Nov of 2007, a global settlement was reached in the amount of $4.85 billion to settle eligible claims).

- *In re: Emerson Electric Co. Wet/Dry Vac Marketing and Sales Practices Litigation*, 4:12-md-02382-HEA (Class Action related to Ridgid wet/dry vacs).

- *Todd, et al. v. Tempur Sealy International, Inc., et al.*, Case No. 3:13-cv-4984 (Class action related to Tempur Sealy's misleading marketing campaign regarding the health benefits of its products).

## RECENT NOTABLE TRIAL RESULTS

The firm has extensive jury trial experience in significant, complex cases. In the past thirteen months alone, The Simon Law Firm, P.C., has achieved three jury verdicts totaling nearly $2 billion. The Simon Law Firm served as lead counsel in each of these cases. Those cases are:

*Eileen Williams, Elizabeth Perkins, Summer Tailor v. Wabash National Corporation, et al.*, Case No. 2022-CC00495 (City of St. Louis Mo. Cir. Ct. Sept. 2024)

- A St. Louis City jury rendered a $462 million verdict against a trailer manufacturer, Wabash National Corporation, finding the company responsible for the deaths of two young fathers killed when their car went underneath the rear of a trailer. The jury awarded $462 million in damages. That included $6 million to each family, for a total of $12 million in compensatory damages, and $450 million in punitive damages. Simon Law presented how the federal standard on Rear Impact Guards or RIGs was developed, including evidence that the industry lobbied against stronger regulations and watered down whatever got passed, resulting in an ineffective and meaningless minimum federal standard that Wabash—and the entire industry— knew did not prevent underride in a wide variety of foreseeable and survivable crashes.



*Rachael Capriglione, as natural mother and next friend of A. T., a minor v. The Pavilion Foundation d/b/a The Pavilion Behavioral System*, Case No. 21-L-176 (Champaign Ill. County Cir. Ct. March 2024)

- A Champaign County jury awarded a $535 million verdict to a girl who was raped when she was 13 years old at a psychiatric residential treatment center. Simon Law Firm attorneys proved the facility could have prevented the 2020 attack. It took the jury 6 ½ hours to deliver its verdict—the largest known award in Illinois history. The jury awarded $60 million in compensatory damages—$20 million for the child's "loss of normal life" and $40 million for her "pain and suffering." It also included $475 million in punitive damages against the defendant, Pavilion Behavioral Health System, which operated the facility where the assault happened. It is an Illinois-based subsidiary of for-profit hospital operator Universal Health Services. The trial lasted eight days.

*Karen Chaplin and Jason Politte v. Trenton Geiger, et al.*, Case No. 20SL-CC06071 (St. Louis Mo. County Cir. Ct. Sept. 2023)

- A St. Louis County jury found United Brands Products Design Development and Marketing, Inc. (an international distributor of nitrous oxide) and Coughing Cardinal, LLC (a local head shop) guilty of conspiring to sell nitrous oxide—a known inhalant drug—as an inhalant to consumers. The underground industry led to a car crash that caused the wrongful death of 25-year-old Marissa Politte. The jury awarded $745 million following a two-week trial.

## PROPOSED CLASS COUNSEL BIOGRAPHIES

### Jeremiah W. Nixon

Jeremiah (Jer) W. Nixon's practice focuses on class actions and business litigation. He has substantial experience litigating complex cases against major corporations and has achieved significant results for his clients. He was part of the team that litigated *CS Wang, et al. v. Wells Fargo, et al.* (1:16-cv-11223, N.D. Ill.), a class action brought under the California Invasion of Privacy Act that settled for $78 million. Jer earned his Bachelor of Arts and his law degree from the University of Missouri. Jer began his career at one of the largest law firms in St. Louis, representing plaintiffs and defendants in business litigation. Immediately before joining The Simon Law Firm, Jer worked at a complex litigation firm in Chicago, litigating class actions and complex business disputes. At The Simon Law Firm, P.C., Jer represents businesses, individuals, and organizations in high-stakes litigation, bringing a direct and trial-ready approach to complex matters. Jer is licensed in Illinois and Missouri, and in various federal courts across the country.

### Anthony G. Simon

Anthony (Tony) G. Simon is a registered patent attorney who has spent his career litigating complex matters. His practice focuses on class actions, mass torts, intellectual property, and other complex commercial litigation. Tony has served as lead trial counsel in hundreds of patent, copyright, trademark, antitrust and other intellectual property cases in courts across the United States. This



includes cases against global corporations, such as Apple and Google. Tony has tried cases to verdict in both state and federal courts and has argued in several federal courts of appeal across the country. Tony has a Bachelor of Science degree in Electrical Engineering from the University of Notre Dame, and he earned his law degree at St. Louis University School of Law. In his decades of practice, Tony has represented both plaintiffs and defendants. Tony has received numerous awards for his work, including being named a Missouri and Kansas Super Lawyer every year since 2010. Recently, Tony was named 2025 Best Lawyers "Lawyer of the Year" for bet-the-company litigation in the St. Louis Area. Tony is licensed in Illinois and Missouri, and in various federal courts across the county