# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SAM WELBEL, MICHAEL ARCHER, and DYLAN MACALUSO, individually and on behalf of all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) No.: 1:24-cv-06426 |
| v. | ) ) |
| SHOUT! FACTORY, LLC, | ) Hon. Thomas M. Durkin ) |
| Defendant. | ) ) |

## DECLARATION OF KATHY CALLAHAN

I, Kathy Callahan, respectfully declare as follows:

1.     My name is Kathy Callahan. I am Head of Ecommerce for Shout! Factory, LLC ("Shout! Factory").

2.     Through my role as Head of Ecommerce, I am familiar with Shout! Factory's use of technology on its website, www.shoutfactory.com ("Website").

3.     Shout! Factory formerly used technology provided by Zigpoll on the Website exclusively to conduct polls and surveys when a customer placed an order and prior to fulfillment of that order. Shout! Factory removed Zigpoll from the Website last year and no longer uses Zigpoll.

4.     When Shout! Factory first implemented the Zigpoll technology on the Website, Shout! Factory agreed to Zigpoll's Terms & Policies ("Terms & Policies").[1] A true and correct copy of these Terms and Policies is attached hereto as **Exhibit 1.** These Terms and Policies were

---

[1] Also available at https://www.zigpoll.com/terms-and-policies.

in effect during the entire time period that Shout! Factory used the Zigpoll technology on the Website.

5.       Pursuant to the Terms and Policies, Shout! Factory had exclusive ownership and control over all customer data collected via the Zigpoll technology. For example, Section 3.1 of the Terms & Policies provides that:

> As between the parties, Customer [Shout! Factory] will retain all right, title and interest (including any and all intellectual property rights) in and to the Customer Data as provided to Zigpoll. Subject to the terms of this Agreement, Customer hereby grants to Zigpoll a non-exclusive, worldwide, royalty-free right to use, copy, store, transmit, modify, create derivative works of and display the Customer Data solely to the extent necessary to provide the Services to Customer. **Exhibit 1**, § 3.1.

6.       The Terms & Policies further explained that Zigpoll is only allowed to use the data collected to the extent necessary to provide the services to Shout! Factory.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: March 12, 2025

- 2 -

# EXHIBIT 1



## Zigpoll Subscription Terms of Service

Effective day 2 April 2019

This Zigpoll Subscription Terms of Service ("**Agreement**") is entered into by and between Argonautic Labs LLC ("**Zigpoll**") and the entity or person placing an order for or accessing any Services ("**Customer**" or "**you**"). If you are accessing or using the Services on behalf of your company, you represent that you are authorized to accept this Agreement on behalf of your company, and all references to "you" or "Customer" reference your company.

This Agreement permits Customer to purchase subscriptions to online software-as-a-service products and other services from Zigpoll pursuant to any Zigpoll ordering documents, online registration, order descriptions or order confirmations referencing this Agreement ("**Order Form(s)**") and sets forth the basic terms and conditions under which those products and services will be delivered. This Agreement will govern Customer's initial purchase on the Effective Date as well as any future purchases made by Customer that reference this Agreement.

The "**Effective Date**" of this Agreement is the date which is the earlier of (a) Customer's initial access to any Service (as defined below) through any online provisioning, registration or order process or (b) the effective date of the first Order Form referencing this Agreement.

**Modifications to this Agreement** : From time to time, Zigpoll may modify this Agreement. Unless otherwise specified by Zigpoll, changes become effective for Customer upon renewal of Customer's current Subscription Term (as defined below) or entry into a new Order Form. Zigpoll will use reasonable efforts to notify Customer of the changes through communications via Customer's account, email or other means. Customer may be required to click to accept or otherwise agree to the modified Agreement before renewing a Subscription Term or entering into a new Order Form, and in any event continued use of the Services after the updated version of this Agreement goes into effect will constitute Customer's acceptance of such updated version. If Zigpoll specifies that changes to the

Agreement will take effect prior to Customer's next renewal or order (such as for legal compliance or product change reasons) and Customer objects to such changes, Customer may terminate the applicable Subscription Term and receive as its sole remedy a refund of any fees Customer has pre-paid for use of the applicable Services for the terminated portion of the Subscription Term.

**BY INDICATING YOUR ACCEPTANCE OF THIS AGREEMENT OR ACCESSING OR USING ANY SERVICES, YOU ARE AGREEING TO BE BOUND BY ALL TERMS, CONDITIONS, AND NOTICES CONTAINED OR REFERENCED IN THIS AGREEMENT. IF YOU DO NOT AGREE TO THIS AGREEMENT, PLEASE DO NOT USE ANY SERVICES. FOR CLARITY, EACH PARTY EXPRESSLY AGREES THAT THIS AGREEMENT IS LEGALLY BINDING UPON IT. THIS AGREEMENT CONTAINS MANDATORY ARBITRATION PROVISIONS THAT REQUIRE THE USE OF ARBITRATION TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS. PLEASE READ IT CAREFULLY.**

## 1. Definitions

"**Affiliate**" means any entity under the control of Customer where "control" means ownership of or the right to control greater than 50% of the voting securities of such entity.

"**AUP**" means Zigpoll's Acceptable Use Policy, available at https://www.zigpoll.com/acceptable-use-policy or a successor URL.

"**Contractor**" means an independent contractor or consultant who is not a competitor of Zigpoll.

"**Customer Data**" means any data of any type that is submitted to the Services by or on behalf of Customer, including without limitation: (a) data submitted, uploaded or imported to the Services by Customer (including from Third Party Platforms) and (b) data provided by or about People (including chat and message logs) that are collected from the Customer Properties using the Services.

"**Customer Properties**" means Customer's websites, apps, or other offerings owned and operated by (or for the benefit of) Customer through which Customer uses the Services to communicate with People.

"**Dashboard**" means Zigpoll's user interface for accessing and administering the Services that Customer may access via the web or the Zigpoll Apps.

"**Documentation**" means the technical user documentation provided with the Services.

"**Feedback**" means comments, questions, suggestions or other feedback relating to any Zigpoll product or service.

"**Zigpoll App**" means any mobile application or desktop client software included in the applicable Service that is made available by Zigpoll.

"**Zigpoll Code**" means certain JavaScript code, software development kits (SDKs) or other code provided by Zigpoll for deployment on Customer Properties.

"**Laws**" means all applicable local, state, federal and international laws, regulations and conventions, including, without limitation, those related to data privacy and data transfer, international communications, and the exportation of technical or personal data.

"**People**" (in the singular, "**Person**") means Customer's end user customers, potential customers, and other users of and visitors to the Customer Properties.

"**Permitted User**" means an employee or Contractor of Customer or its Affiliate who is authorized to access the Service.

"**Sensitive Personal Information**" means any of the following: (i) credit, debit or other payment card data subject to the Payment Card Industry Data Security Standards ("**PCI DSS**"); (ii) patient, medical or other protected health information regulated by the Health Insurance Portability and Accountability Act ("**HIPAA**"); or (iii) any other personal data of an EU citizen deemed to be in a "special category" (as identified in EU General Data Protection Regulation or any successor directive or regulation).

"**Services**" means Zigpoll's proprietary software-as-a-service solution(s), including the Dashboard, Zigpoll application programming interfaces (APIs), Zigpoll Code and Zigpoll Apps, as described in the applicable Order Form.

"**Taxes**" means any sales, use, GST, value-added, withholding, or similar taxes or levies, whether domestic or foreign, other than taxes based on the income of Zigpoll.

"**Third-Party Platform**" means any software, software-as-a-service, data sources or other products or services not provided by Zigpoll that are integrated with Services as described in the Documentation.

## 2. Zigpoll Services

2.1. **Services Overview.** Zigpoll's Services are a suite of polling software-as-a-service solutions offered through a single platform. The Services are designed to enable Customer to manage polling and feedback with People through the entire lifecycle of their relationship with Customer and to provide a Dashboard for accessing and managing Customer Data regarding those People.

2.2. **Provision of Services.** Each Service is provided on a subscription basis for a set term designated on the Order Form (each, a "**Subscription Term**"). Zigpoll may also offer Professional Services (as defined in Section 12) related to certain Services. Customer will purchase and Zigpoll will provide the specific Services and related Professional Services (if any) as specified in the applicable Order Form.

2.3. **Access to Services** . Customer may access and use the Services solely for its own benefit and in accordance with the terms and conditions of this Agreement, the Documentation and any scope of

use restrictions designated in the applicable Order Form (including without limitation the number of People tracked). Use of and access to the Services is permitted only by Permitted Users. If Customer is given API keys or passwords to access the Services on Zigpoll's systems, Customer will require that all Permitted Users keep API keys, user ID and password information strictly confidential and not share such information with any unauthorized person. User IDs are granted to individual, named persons and may not be shared. If Customer is accessing the Services using credentials provided by a third party (e.g., Google), then Customer will comply with all applicable terms and conditions of such third party regarding provisioning and use of such credentials. Customer will be responsible for any and all actions taken using Customer's accounts and passwords. If any Permitted User who has access to a user ID is no longer an employee (or Contractor, as set forth below) of Customer, then Customer will immediately delete such user ID and otherwise terminate such Permitted User's access to the Service. The right to use the Services includes the right to deploy Zigpoll Code on Customer Properties in order to enable messaging, chat and similar functionality and to collect Customer Data for use with the Services as further described below.

2.4. **Zigpoll Apps.** To the extent Zigpoll provides Zigpoll Apps for use with the Services, subject to all of the terms and conditions of this Agreement, Zigpoll grants to Customer a limited, non-transferable, non-sublicensable, non-exclusive license during any applicable Subscription Term to use the object code form of the Zigpoll Apps internally, but only in connection with Customer's use of the Service and otherwise in accordance with the Documentation and this Agreement.

2.5. **Deployment of Zigpoll Code**. Subject to all of the terms and conditions of this Agreement, Zigpoll grants to Customer a limited, non-transferable, non-sublicensable, non-exclusive license during any applicable Subscription Term to copy the Zigpoll Code in the form provided by Zigpoll on Customer Properties solely to support Customer's use of the Service and otherwise in accordance with the Documentation and this Agreement. Customer must implement Zigpoll Code on the Customer Properties in order to enable features of the Services. Customer will implement all Zigpoll Code in strict accordance with the Documentation and other instructions provided by Zigpoll. Customer acknowledges that any changes made to the Customer Properties after initial implementation of Zigpoll Code may cause the Services to cease working or function improperly and that Zigpoll will have no responsibility for the impact of any such Customer changes.

2.6. **Contractors and Affiliates.** Customer may permit its Contractors and its Affiliates' employees and Contractors to serve as Permitted Users, provided Customer remains responsible for compliance by such individuals with all of the terms and conditions of this Agreement, and any use of the Services by such individuals is for the sole benefit of Customer.

2.7. **General Restrictions.** Customer will not (and will not permit any third party to): (a) rent, lease, provide access to or sublicense the Services to a third party; (b) use the Services to provide, or incorporate the Services into, any product or service provided to a third party; (c) reverse engineer, decompile, disassemble, or otherwise seek to obtain the source code or non-public APIs to the Services, except to the extent expressly permitted by applicable law (and then only upon advance

notice to Zigpoll); (d) copy or modify the Services or any Documentation, or create any derivative work from any of the foregoing; (e) remove or obscure any proprietary or other notices contained in the Services (including without limitation (i) the "Powered by Zigpoll" designation that may appear as part of the deployment of the Services on Customer Properties and (ii) notices on any reports or data printed from the Services); or (f) publicly disseminate information regarding the performance of the Services.

2.8. **Zigpoll APIs**. If Zigpoll makes access to any APIs available as part of the Services, Zigpoll reserves the right to place limits on access to such APIs (e.g., limits on numbers of calls or requests). Further, Zigpoll may monitor Customer's usage of such APIs and limit the number of calls or requests Customer may make if Zigpoll believes that Customer's usage is in breach of this Agreement or may negatively affect the Services (or otherwise impose liability on Zigpoll).

## 3. Customer Data

3.1. **Rights in Customer Data.** As between the parties, Customer will retain all right, title and interest (including any and all intellectual property rights) in and to the Customer Data as provided to Zigpoll. Subject to the terms of this Agreement, Customer hereby grants to Zigpoll a non-exclusive, worldwide, royalty-free right to use, copy, store, transmit, modify, create derivative works of and display the Customer Data solely to the extent necessary to provide the Services to Customer.

3.2. **Storage of Customer Data** . Zigpoll does not provide an archiving service. Zigpoll agrees only that it will not intentionally delete any Customer Data from any Service prior to termination of Customer's applicable Subscription Term. Zigpoll expressly disclaims all other obligations with respect to storage.

3.3. **Customer Obligations** .

a) In General. Customer is solely responsible for the accuracy, content and legality of all Customer Data. Customer represents and warrants to Zigpoll that Customer has all necessary rights, consents and permissions to collect, share and use all Customer Data as contemplated in this Agreement (including granting Zigpoll the rights in Section 3.1 (Rights in Customer Data)) and that no Customer Data will violate or infringe (i) any third party intellectual property, publicity, privacy or other rights, (ii) any Laws, or (iii) any terms of service, privacy policies or other agreements governing the Customer Properties or Customer's accounts with any Third-Party Platforms. Customer further represents and warrants that all Customer Data complies with the AUP. Customer will be fully responsible for any Customer Data submitted to the Services by any Person as if it was submitted by Customer.

b) No Sensitive Personal Information. Customer specifically agrees not to use the Services to collect, store, process or transmit any Sensitive Personal Information. Customer acknowledges that Zigpoll is not a Business Associate or subcontractor (as those terms are defined in HIPAA) or a payment card processor and that the Services are neither HIPAA nor PCI DSS compliant. Zigpoll will have no liability

under this Agreement for Sensitive Personal Information, notwithstanding anything to the contrary herein.

c) Compliance with Laws. Customer agrees to comply with all applicable Laws in its use of the Services. Without limiting the generality of the foregoing, Customer will not engage in any unsolicited advertising, marketing, or other activities using the Services, including without limitation any activities that violate the Telephone Consumer Protection Act of 1991, CAN-SPAM Act of 2003 or any other anti-spam laws and regulations.

d) Disclosures on Customer Properties. Customer acknowledges that the Zigpoll Code causes a unique cookie ID to be associated with each Person who accesses the Customer Properties, which cookie ID enables Zigpoll to provide the Services. Customer will include on each Customer Property a link to its privacy policy that discloses Customer's use of third party tracking technology to collect data about People as described in this Agreement. Customer's privacy policy must disclose how, and for what purposes, the data collected through Zigpoll Code will be used or shared with Zigpoll as part of the Services. Customer must also provide People with clear and comprehensive information about the storing and accessing of cookies or other information on the Peoples' devices where such activity occurs in connection with the Services and as required by applicable Laws. For clarity, as between Customer and Zigpoll, Customer will be solely responsible for obtaining the necessary clearances, consents and approvals from People under all applicable Laws.

3.4. **Indemnification by Customer.** Customer will indemnify, defend and hold harmless Zigpoll from and against any and all claims, costs, damages, losses, liabilities and expenses (including reasonable attorneys' fees and costs) arising out of or in connection with any claim arising from or relating to any Customer Data or breach or alleged breach by Customer of Section 3.3 (Customer Obligations). This indemnification obligation is subject to Customer receiving (i) prompt written notice of such claim (but in any event notice in sufficient time for Customer to respond without prejudice); (ii) the exclusive right to control and direct the investigation, defense, or settlement of such claim; and (iii) all necessary cooperation of Zigpoll at Customer's expense. Notwithstanding the foregoing sentence, (a) Zigpoll may participate in the defense of any claim by counsel of its own choosing, at its cost and expense and (b) Customer will not settle any claim without Zigpoll's prior written consent, unless the settlement fully and unconditionally releases Zigpoll and does not require Zigpoll to pay any amount, take any action, or admit any liability.

3.5. **Aggregated Anonymous Data** . Notwithstanding anything to the contrary herein, Customer agrees that Zigpoll may obtain and aggregate technical and other data about Customer's use of the Services that is non-personally identifiable with respect to Customer ("**Aggregated Anonymous Data**"), and Zigpoll may use the Aggregated Anonymous Data to analyze, improve, support and operate the Services and otherwise for any business purpose during and after the term of this Agreement, including without limitation to generate industry benchmark or best practice guidance, recommendations or similar reports for distribution to and consumption by Customer and other

Zigpoll customers. For clarity, this Section 3.5 does not give Zigpoll the right to identify Customer as the source of any Aggregated Anonymous Data.

## 4. Security

Zigpoll agrees to use commercially reasonable technical and organizational measures designed to prevent unauthorized access, use, alteration or disclosure of any Service or Customer Data. However, Zigpoll will have no responsibility for errors in transmission, unauthorized third-party access or other causes beyond Zigpoll's control.

## 5. Third-Party Platforms

The Services may support integrations with certain Third-Party Platforms. In order for the Services to communicate with such Third-Party Platforms, Customer may be required to input credentials in order for the Services to access and receive relevant information from such Third-Party Platforms. By enabling use of the Services with any Third-Party Platform, Customer authorizes Zigpoll to access Customer's accounts with such Third-Party Platform for the purposes described in this Agreement. Customer is solely responsible for complying with any relevant terms and conditions of the Third-Party Platforms and maintaining appropriate accounts in good standing with the providers of the Third-Party Platforms. Customer acknowledges and agrees that Zigpoll has no responsibility or liability for any Third-Party Platform or any Customer Data exported to a Third-Party Platform. Zigpoll does not guarantee that the Services will maintain integrations with any Third-Party Platform and Zigpoll may disable integrations of the Services with any Third-Party Platform at any time with or without notice to Customer. For clarity, this Agreement governs Customer's use of and access to the Services, even if accessed through an integration with a Third-Party Platform.

## 6. Ownership

6.1. **Zigpoll Technology**. This is a subscription agreement for access to and use of the Services. Customer acknowledges that it is obtaining only a limited right to the Services and that irrespective of any use of the words "purchase", "sale" or like terms in this Agreement no ownership rights are being conveyed to Customer under this Agreement. Customer agrees that Zigpoll or its suppliers retain all right, title and interest (including all patent, copyright, trademark, trade secret and other intellectual property rights) in and to the Services and all Documentation, professional services deliverables and any and all related and underlying technology and documentation and any derivative works, modifications or improvements of any of the foregoing, including as may incorporate Feedback (collectively, "**Zigpoll Technology**"). Except as expressly set forth in this Agreement, no rights in any Zigpoll Technology are granted to Customer. Further, Customer acknowledges that the Services are

offered as an on-line, hosted solution, and that Customer has no right to obtain a copy of any of the Services, except for Zigpoll Code and the Zigpoll Apps in the format provided by Zigpoll.

6.2. **Feedback**. Customer, from time to time, may submit Feedback to Zigpoll. Zigpoll may freely use or exploit Feedback in connection with any of its products or services.

## 7. Subscription Term, Fees & Payment

7.1. **Subscription Term and Renewals**. Unless otherwise specified on the applicable Order Form, each Subscription Term will automatically renew for additional one month periods unless either party gives the other written notice of termination at least one month prior to expiration of the then-current Subscription Term.

7.2. **Fees and Payment** . All fees are as set forth in the applicable Order Form and will be paid by Customer within thirty (30) days of invoice, unless (a) Customer is paying via Credit Card (as defined below) or (b) otherwise specified in the applicable Order Form. Except as expressly set forth in Section 9 (Limited Warranty) and Section 14 (Indemnification), all fees are non-refundable. The rates are valid for the initial month period of each Subscription Term and thereafter may be subject to an automatic adjustment increase. Customer is responsible for paying all Taxes, and all Taxes are excluded from any fees set forth in the applicable Order Form. If Customer is required by Law to withhold any Taxes from Customer's payment, the fees payable by Customer will be increased as necessary so that after making any required withholdings, Zigpoll receives and retains (free from any liability for payment of Taxes) an amount equal to the amount it would have received had no such withholdings been made. Any late payments will be subject to a service charge equal to 1.5% per month of the amount due or the maximum amount allowed by law, whichever is less.

7.3. **Payment Via Credit Card.** If you are purchasing the Services via credit card, debit card or other payment card ("Credit Card"), the following terms apply:

   a) Recurring Billing Authorization. By providing Credit Card information and agreeing to purchase any Services, Customer hereby authorizes Zigpoll (or its designee) to automatically charge Customer's Credit Card on the same date of each calendar month (or the closest prior date, if there are fewer days in a particular month) during the Subscription Term for all fees accrued as of that date (if any) in accordance with the applicable Order Form. Customer acknowledges and agrees that the amount billed and charged each month may vary depending on Customer's use of the Services and may include subscription fees for the remainder of Customer's applicable billing period and overage fees for the prior month.

   b) Foreign Transaction Fees. Customer acknowledges that for certain Credit Cards, the issuer of Customer's Credit Card may charge a foreign transaction fee or other charges.

   c) Invalid Payment. If a payment is not successfully settled due to expiration of a Credit Card, insufficient funds, or otherwise, Customer remains responsible for any amounts not remitted to

Zigpoll and Zigpoll may, in its sole discretion, either (i) invoice Customer directly for the deficient amount, (ii) continue billing the Credit Card once it has been updated by Customer (if applicable) or (iii) terminate this Agreement.

d) <u>Changing Credit Card Information.</u> At any time, Customer may change its Credit Card information by entering updated Credit Card information via the "Settings" page on the Dashboard.

e) <u>Termination of Recurring Billing.</u> In addition to any termination rights set forth in this Agreement, Customer may terminate the Subscription Term by sending Zigpoll notice of non-renewal to **support@zigpoll.com** in accordance with Section 7.1 (Subscription Term and Renewals) or, if Customer's Subscription Term is on a monthly basis (or if otherwise permitted by Zigpoll), by terminating via the "Settings" page on the Dashboard, with termination effective at the end of the current Subscription Term. As set forth in Section 2.9 (Trial Subscriptions), if Customer does not enter into a paid Subscription Term following a Trial Period, this Agreement and Customer's right to access and use the Services will terminate at the end of the Trial Period and Customer's Credit Card will not be charged.

f) <u>Payment of Outstanding Fees.</u> Upon any termination or expiration of the Subscription Term, Zigpoll will charge Customer's Credit Card (or invoice Customer directly) for any outstanding fees for Customer's use of the Services during the Subscription Term, after which Zigpoll will not charge Customer's Credit Card for any additional fees.

7.4. **Suspension of Service**. If Customer's account is thirty (30) days or more overdue, in addition to any of its other rights or remedies (including but not limited to any termination rights set forth herein), Zigpoll reserves the right to suspend Customer's access to the applicable Service (and any related services) without liability to Customer until such amounts are paid in full. Zigpoll also reserves the right to suspend Customer's access to the Services without liability to Customer if Customer's use of the Services is in violation of the AUP.

## 8. Term and Termination

8.1. **Term**. This Agreement is effective as of the Effective Date and expires on the date of expiration or termination of all Subscription Terms.

8.2. **Termination for Cause**. Either party may terminate this Agreement (including all related Order Forms) if the other party (a) fails to cure any material breach of this Agreement (including a failure to pay fees) within thirty (30) days after written notice; (b) ceases operation without a successor; or (c) seeks protection under any bankruptcy, receivership, trust deed, creditors' arrangement, composition, or comparable proceeding, or if any such proceeding is instituted against that party (and not dismissed within sixty (60) days thereafter).

8.3. **Effect of Termination**. Upon any expiration or termination of this Agreement, Customer will immediately cease any and all use of and access to all Services (including any and all related Zigpoll

Technology) and delete (or, at Zigpoll's request, return) any and all copies of the Documentation, any Zigpoll passwords or access codes and any other Zigpoll Confidential Information in its possession. Provided this Agreement was not terminated for Customer's breach, Customer may retain and use internally copies of all reports exported from any Service prior to termination. Customer acknowledges that following termination it will have no further access to any Customer Data input into any Service, and that Zigpoll may delete any such data as may have been stored by Zigpoll at any time. Except where an exclusive remedy is specified, the exercise of either party of any remedy under this Agreement, including termination, will be without prejudice to any other remedies it may have under this Agreement, by law or otherwise.

8.4. **Survival**. The following Sections will survive any expiration or termination of this Agreement: 2.7 (General Restrictions), 2.9 (Trial Subscriptions), 3.2 (Storage of Customer Data), 3.4 (Indemnification by Customer), 3.5 (Aggregated Anonymous Data), 6 (Ownership), 7.2 (Fees and Payment), 7.3 (Payment Via Credit Card), 8 (Term and Termination), 9.2 (Warranty Disclaimer), 13 (Limitation of Remedies and Damages), 14 (Indemnification), 15 (Confidential Information) and 17 (General Terms).

## 9. Limited Warranty

9.1. **Limited Warranty** . Zigpoll warrants, for Customer's benefit only, that each Service will operate in substantial conformity with the applicable Documentation. Zigpoll's sole liability (and Customer's sole and exclusive remedy) for any breach of this warranty will be, at no charge to Customer, for Zigpoll to use commercially reasonable efforts to correct the reported non-conformity, or if Zigpoll determines such remedy to be impracticable, either party may terminate the applicable Subscription Term and Customer will receive as its sole remedy a refund of any fees Customer has pre-paid for use of such Service for the terminated portion of the applicable Subscription Term. The limited warranty set forth in this Section 9.1 will not apply: (i) unless Customer makes a claim within thirty (30) days of the date on which Customer first noticed the non-conformity, (ii) if the error was caused by misuse, unauthorized modifications or third-party hardware, software or services, or (iii) to use provided on a no-charge, trial or evaluation basis.

9.2. **Warranty Disclaimer** . EXCEPT FOR THE LIMITED WARRANTY IN SECTION 9.1, ALL SERVICES AND PROFESSIONAL SERVICES ARE PROVIDED "AS IS". NEITHER ZIGPOLL NOR ITS SUPPLIERS MAKES ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT. ZIGPOLL DOES NOT WARRANT THAT CUSTOMER'S USE OF THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE, NOR DOES ZIGPOLL WARRANT THAT IT WILL REVIEW THE CUSTOMER DATA FOR ACCURACY OR THAT IT WILL PRESERVE OR MAINTAIN THE CUSTOMER DATA WITHOUT LOSS OR CORRUPTION. ZIGPOLL SHALL NOT BE LIABLE FOR THE RESULTS OF ANY COMMUNICATIONS SENT OR ANY COMMUNICATIONS THAT WERE FAILED TO BE SENT USING THE SERVICES. ZIGPOLL SHALL NOT BE LIABLE FOR DELAYS, INTERRUPTIONS, SERVICE FAILURES OR OTHER PROBLEMS INHERENT IN USE OF THE INTERNET AND ELECTRONIC COMMUNICATIONS, THIRD-PARTY PLATFORMS OR OTHER SYSTEMS OUTSIDE THE REASONABLE

CONTROL OF ZIGPOLL. CUSTOMER MAY HAVE OTHER STATUTORY RIGHTS, BUT THE DURATION OF STATUTORILY REQUIRED WARRANTIES, IF ANY, SHALL BE LIMITED TO THE SHORTEST PERIOD PERMITTED BY LAW.

## 10. Availability and Service Credits

The Services are available subject to Zigpoll's Service Level Agreement. ("**SLA**").

## 11. Support

During the Subscription Term of each Service, Zigpoll will provide end user support in accordance with Zigpoll's Support Policy ("**Support Policy**").

## 12. Professional Services

Zigpoll will provide the professional consulting services ("**Professional Services**") purchased in the applicable Order Form. The scope of Professional Services will be as set forth in a Statement of Work referencing this Agreement and executed by both parties describing the work to be performed, fees and any applicable milestones, dependencies and other technical specifications or related information ("**SOW**"). Unless Professional Services are provided on a fixed-fee basis, Customer will pay Zigpoll at the per-hour rates set forth in the Order Form (or, if not specified, at Zigpoll's then-standard rates) for any excess services. Customer will reimburse Zigpoll for reasonable travel and lodging expenses as incurred. Customer may use anything delivered as part of the Professional Services in support of authorized use of the Services and subject to the terms regarding Customer's rights to use the Service set forth in Section 2 (Zigpoll Services) and the applicable SOW, but Zigpoll will retain all right, title and interest in and to any such work product, code or deliverables and any derivative, enhancement or modification thereof created by Zigpoll (or its agents).

## 13. Limitation of Remedies and Damages

13.1. **Consequential Damages Waiver.** EXCEPT FOR EXCLUDED CLAIMS (DEFINED BELOW), NEITHER PARTY (NOR ITS SUPPLIERS) SHALL HAVE ANY LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT FOR ANY LOSS OF USE, LOST DATA, LOST PROFITS, FAILURE OF SECURITY MECHANISMS, INTERRUPTION OF BUSINESS, OR ANY INDIRECT, SPECIAL, INCIDENTAL, RELIANCE, OR CONSEQUENTIAL DAMAGES OF ANY KIND, EVEN IF INFORMED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE.

13.2. **Liability Cap.** ZIGPOLL'S AND ITS SUPPLIERS' ENTIRE LIABILITY TO CUSTOMER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL NOT EXCEED THE AMOUNT ACTUALLY PAID BY

CUSTOMER TO ZIGPOLL DURING THE PRIOR TWELVE (12) MONTHS UNDER THIS AGREEMENT.

13.3. **Excluded Claims. "Excluded Claims**" means any claim arising (a) from Customer's breach of Section 2.7 (General Restrictions); (b) under Section 3.3 (Customer Obligations) or 3.4 (Indemnification by Customer); or (c) from a party's breach of its obligations in Section 15 (Confidential Information) (but excluding claims arising from operation or non-operation of any Service).

13.4. **Nature of Claims and Failure of Essential Purpose**. The parties agree that the waivers and limitations specified in this Section 13 apply regardless of the form of action, whether in contact, tort (including negligence), strict liability or otherwise and will survive and apply even if any limited remedy specified in this Agreement is found to have failed of its essential purpose.

## 14. Indemnification

Zigpoll will defend Customer from and against any claim by a third party alleging that a Service when used as authorized under this Agreement infringes a U.S. or Canadian patent, U.S. or Canadian copyright, or U.S. or Canadian trademark and will indemnify and hold harmless Customer from and against any damages and costs finally awarded against Customer or agreed in settlement by Zigpoll (including reasonable attorneys' fees) resulting from such claim, provided that Zigpoll will have received from Customer: (i) prompt written notice of such claim (but in any event notice in sufficient time for Zigpoll to respond without prejudice); (ii) the exclusive right to control and direct the investigation, defense and settlement (if applicable) of such claim; and (iii) all reasonable necessary cooperation of Customer. If Customer's use of a Service is (or in Zigpoll's opinion is likely to be) enjoined, if required by settlement or if Zigpoll determines such actions are reasonably necessary to avoid material liability, Zigpoll may, in its sole discretion: (a) substitute substantially functionally similar products or services; (b) procure for Customer the right to continue using such Service; or if (a) and (b) are not commercially reasonable, (c) terminate this Agreement and refund to Customer the fees paid by Customer for the portion of the Subscription Term that was paid by Customer but not rendered by Zigpoll. The foregoing indemnification obligation of Zigpoll will not apply: (1) if such Service is modified by any party other than Zigpoll, but solely to the extent the alleged infringement is caused by such modification; (2) if such Service is combined with products or processes not provided by Zigpoll, but solely to the extent the alleged infringement is caused by such combination; (3) to any unauthorized use of such Service; (4) to any action arising as a result of Customer Data or any third-party deliverables or components contained within such Service; (5) to the extent the alleged infringement is not caused by the particular technology or implementation of the Service but instead by features common to any similar product or service; or (6) if Customer settles or makes any admissions with respect to a claim without Zigpoll's prior written consent. THIS SECTION 14 SETS FORTH ZIGPOLL'S AND ITS SUPPLIERS' SOLE LIABILITY AND CUSTOMER'S SOLE AND EXCLUSIVE REMEDY WITH RESPECT TO ANY CLAIM OF INTELLECTUAL PROPERTY INFRINGEMENT.

## 15. Confidential Information

Each party (as "**Receiving Party**") agrees that all code, inventions, know-how, business, technical and financial information it obtains from the disclosing party ("**Disclosing Party**") constitute the confidential property of the Disclosing Party ("**Confidential Information**"), provided that it is identified as confidential at the time of disclosure or should be reasonably known by the Receiving Party to be confidential or proprietary due to the nature of the information disclosed and the circumstances surrounding the disclosure. Any Zigpoll Technology, performance information relating to any Service, and the terms and conditions of this Agreement will be deemed Confidential Information of Zigpoll without any marking or further designation. Except as expressly authorized herein, the Receiving Party will (1) hold in confidence and not disclose any Confidential Information to third parties and (2) not use Confidential Information for any purpose other than fulfilling its obligations and exercising its rights under this Agreement. The Receiving Party may disclose Confidential Information to its employees, agents, contractors and other representatives having a legitimate need to know (including, for Zigpoll, the subcontractors referenced in Section 17.8 (Subcontractors)), provided that such representatives are bound to confidentiality obligations no less protective of the Disclosing Party than this Section 15 and that the Receiving Party remains responsible for compliance by any such representative with the terms of this Section 15. The Receiving Party's confidentiality obligations will not apply to information that the Receiving Party can document: (i) was rightfully in its possession or known to it prior to receipt of the Confidential Information; (ii) is or has become public knowledge through no fault of the Receiving Party; (iii) is rightfully obtained by the Receiving Party from a third party without breach of any confidentiality obligation; or (iv) is independently developed by employees of the Receiving Party who had no access to such information. The Receiving Party may make disclosures to the extent required by law or court order, provided the Receiving Party notifies the Disclosing Party in advance and cooperates in any effort to obtain confidential treatment. The Receiving Party acknowledges that disclosure of Confidential Information would cause substantial harm for which damages alone would not be a sufficient remedy, and therefore that upon any such disclosure by the Receiving Party the Disclosing Party will be entitled to seek appropriate equitable relief in addition to whatever other remedies it might have at law.

## 16. Co-Marketing

Customer agrees to participate in reasonable marketing activities that promote the benefits of the Services to other potential customers and the use of Customer's name and logo on Zigpoll's web site and in Zigpoll promotional materials. Customer agrees that Zigpoll may disclose Customer as a customer of Zigpoll.

## 17. General Terms

17.1. **Assignment** . This Agreement will bind and inure to the benefit of each party's permitted successors and assigns. Neither party may assign this Agreement without the advance written consent of the other party, except that either party may assign this Agreement in connection with a

merger, reorganization, acquisition or other transfer of all or substantially all of such party's assets or voting securities. Any attempt to transfer or assign this Agreement except as expressly authorized under this Section 17.1 will be null and void.

17.2. **Severability**. If any provision of this Agreement will be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision will be limited to the minimum extent necessary so that this Agreement will otherwise remain in effect.

17.3. **Governing Law; Dispute Resolution**.

a) Direct Dispute Resolution. In the event of any dispute, claim, question, or disagreement arising from or relating to this Agreement, whether arising in contract, tort or otherwise, ("**Dispute**"), the parties shall first use their best efforts to resolve the Dispute. If a Dispute arises, the complaining party shall provide written notice to the other party in a document specifically entitled "Initial Notice of Dispute," specifically setting forth the precise nature of the dispute ("**Initial Notice of Dispute**"). If an Initial Notice of Dispute is being sent to Zigpoll it must be emailed to support@zigpoll.com.

Following receipt of the Initial Notice of Dispute, the parties shall consult and negotiate with each other in good faith and, recognizing their mutual interest, attempt to reach a just and equitable solution of the Dispute that is satisfactory to both parties ("**Direct Dispute Resolution**"). If the parties are unable to reach a resolution of the Dispute through Direct Dispute Resolution within thirty (30) days of the receipt of the Initial Notice of Dispute, then the Dispute shall subsequently be resolved by arbitration as set forth below.

b) Arbitration. IN THE EVENT THAT A DISPUTE BETWEEN THE PARTIES CANNOT BE SETTLED THROUGH DIRECT DISPUTE RESOLUTION, AS DESCRIBED ABOVE, THE PARTIES AGREE TO SUBMIT THE DISPUTE TO BINDING ARBITRATION. BY AGREEING TO ARBITRATE, THE PARTIES AGREE TO WAIVE THEIR RIGHT TO A JURY TRIAL. The arbitration shall be conducted before a single neutral arbitrator.

The arbitration will occur in New York, New York, but the parties may choose to appear by person, by phone, by another virtual means, or through the submission of documents.

The arbitrator will issue a ruling in writing. Any issue concerning the extent to which any dispute is subject to arbitration, the applicability, interpretation, or enforceability of this agreement shall be resolved by the arbitrator. To the extent state law is applicable, the arbitrator shall apply the substantive law of New York.

All aspects of the arbitration shall be treated as confidential and neither the parties nor the arbitrators may disclose the content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. The result of the arbitration shall be binding on the parties and judgment on the arbitrator's award may be entered in any court having jurisdiction. The arbitrator shall award to the

prevailing party, if any, the costs and attorneys' fees reasonably incurred by the prevailing party in connection with the arbitration.

c) <u>Choice of Law and Jurisdiction</u>. FOR ANY CLAIM WHICH IS NOT SUBJECT TO THIS DISPUTE RESOLUTION PROVISION, CUSTOMER AGREES TO SUBMIT AND CONSENT TO THE PERSONAL AND EXCLUSIVE JURISDICTION IN, AND THE EXCLUSIVE VENUE OF, THE STATE AND FEDERAL COURTS LOCATED WITHIN NEW YORK COUNTY, NEW YORK. IN ANY DISPUTE, NEW YORK LAW SHALL APPLY.

d) <u>Construction and Joinder</u>. THIS AGREEMENT MUST BE CONSTRUED AS IF IT WAS JOINTLY WRITTEN BY BOTH PARTIES. BOTH CUSTOMER AND zigpoll AGREE THAT EACH MAY BRING OR PARTICIPATE IN CLAIMS AGAINST THE OTHER ONLY IN THEIR RESPECTIVE INDIVIDUAL CAPACITIES, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS. NO ARBITRATION OR CLAIM UNDER THIS AGREEMENT SHALL BE JOINED TO ANY OTHER ARBITRATION OR CLAIM, INCLUDING ANY ARBITRATION OR CLAIM INVOLVING ANY OTHER CURRENT OR FORMER USER OF THE SERVICES, AND NO CLASS ARBITRATION PROCEEDINGS SHALL BE PERMITTED. IN THE EVENT OF ANY DISPUTE CONCERNING THE VALIDITY OR ENFORCEABILITY OF THIS PROVISION, SUCH CLAIM MUST BE ADJUDICATED BY A COURT AND NOT BY AN ARBITRATOR.

e) <u>Injunctive Relief</u>. Notwithstanding the above provisions, Zigpoll may apply for injunctive remedies (or an equivalent type of urgent legal relief) in any jurisdiction.

17.4. **Notice**. Any notice or communication required or permitted under this Agreement will be in writing to the parties at the addresses set forth on the Order Form or at such other address as may be given in writing by either party to the other in accordance with this Section and will be deemed to have been received by the addressee (i) if given by hand, immediately upon receipt; (ii) if given by overnight courier service, the first business day following dispatch or (iii) if given by registered or certified mail, postage prepaid and return receipt requested, the second business day after such notice is deposited in the mail.

17.5. **Amendments; Waivers**. Except as otherwise provided herein, no supplement, modification, or amendment of this Agreement will be binding, unless executed in writing by a duly authorized representative of each party to this Agreement. No waiver will be implied from conduct or failure to enforce or exercise rights under this Agreement, nor will any waiver be effective unless in a writing signed by a duly authorized representative on behalf of the party claimed to have waived. No provision of any purchase order or other business form employed by Customer will supersede the terms and conditions of this Agreement, and any such document relating to this Agreement will be for administrative purposes only and will have no legal effect.

17.6. **Entire Agreement**. This Agreement is the complete and exclusive statement of the mutual understanding of the parties and supersedes and cancels all previous written and oral agreements and communications relating to the subject matter of this Agreement. Customer acknowledges that

the Services are on-line, subscription-based products, and that in order to provide improved customer experience Zigpoll may make changes to the Services, and Zigpoll will update the applicable Documentation accordingly. The support and service level availability terms described in the Support Policy and the SLA may be updated from time to time upon reasonable notice to Customer to reflect process improvements or changing practices (but the modifications will not materially decrease Zigpoll's obligations as compared to those reflected in such terms as of the Effective Date).

17.7. **Force Majeure**. Neither party will be liable to the other for any delay or failure to perform any obligation under this Agreement (except for a failure to pay fees) if the delay or failure is due to unforeseen events that occur after the signing of this Agreement and that are beyond the reasonable control of such party, such as a strike, blockade, war, act of terrorism, riot, natural disaster, failure or diminishment of power or telecommunications or data networks or services, or refusal of a license by a government agency.

17.8. **Subcontractors** . Zigpoll may use the services of subcontractors and permit them to exercise the rights granted to Zigpoll in order to provide the Services under this Agreement, provided that Zigpoll remains responsible for (i) compliance of any such subcontractor with the terms of this Agreement and (ii) for the overall performance of the Services as required under this Agreement.

17.9. **Subpoenas**. Nothing in this Agreement prevents Zigpoll from disclosing Customer Data to the extent required by law, subpoenas, or court orders, but Zigpoll will use commercially reasonable efforts to notify Customer where permitted to do so.

17.10. **Independent Contractors**. The parties to this Agreement are independent contractors. There is no relationship of partnership, joint venture, employment, franchise or agency created hereby between the parties. Neither party will have the power to bind the other or incur obligations on the other party's behalf without the other party's prior written consent

17.11. **Export Control**. In its use of the Services, Customer agrees to comply with all export and import laws and regulations of the United States and other applicable jurisdictions. Without limiting the foregoing, (i) Customer represents and warrants that it is not listed on any U.S. government list of prohibited or restricted parties or located in (or a national of) a country that is subject to a U.S. government embargo or that has been designated by the U.S. government as a "terrorist supporting" country, (ii) Customer will not (and will not permit any of its users to) access or use the Services in violation of any U.S. export embargo, prohibition or restriction, and (iii) Customer will not submit to the Services any information that is controlled under the U.S. International Traffic in Arms Regulations

17.12. **Government End-Users**. Elements of the Services are commercial computer software. If the user or licensee of the Services is an agency, department, or other entity of the United States Government, the use, duplication, reproduction, release, modification, disclosure, or transfer of the Services, or any related documentation of any kind, including technical data and manuals, is restricted by a license agreement or by the terms of this Agreement in accordance with Federal Acquisition Regulation

12.212 for civilian purposes and Defense Federal Acquisition Regulation Supplement 227.7202 for military purposes. All Services were developed fully at private expense. All other use is prohibited

17.13. **Counterparts.** This Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will be considered one and the same agreement.


# Privacy Policy

Effective day 2 April 2019


If you are a visitor to a Zigpoll Website, a recipient of Zigpoll communications, a customer of an Zigpoll Service or a teammate of a customer's Zigpoll Service then except as expressly set forth below, this Privacy Policy applies to your use of such Website or Service.

If you are a visitor to or user of a third-party website or service ("Third-Party Property") that utilizes any Zigpoll communication or messaging products (such as the Zigpoll chat widget), then any information you submit to such Third-Party Property (including via the Zigpoll product) is collected under the privacy policy of the owner of such Third-Party Property, and you should contact such owner with any related requests or inquiries you may have. If you have any inquiries about this Privacy Policy, please email our Data Protection Officer at support@zigpoll.com.

At Zigpoll, we respect the privacy rights and data protection rights of our users and recognize the importance of protecting the personal information we collect about you. Our Privacy Policy is designed to help you understand what information we collect and how we use and share that information. This Privacy Policy applies to our Websites and Services.

As used in this Privacy Policy, "**Zigpoll**," "**us**" and "**we**" refers to Zigpoll, Inc. and its affiliates, including without limitation Zigpoll R&D Unlimited Company and Zigpoll Software UK Limited. The "**Websites**" means Zigpoll's websites (including without limitation www.zigpoll.com, www.zigpoll.com, app.zigpoll.com, app.zigpoll.com and any successor URLS, mobile or localized versions and related domains and subdomains), and the "**Services**" means Zigpoll's communications and messaging products, applications and services, in each case in whatever format they may be offered now or in the future. The Websites and Services are collectively referred to herein as the "**Offerings**."


# Information We Collect


**A. Information Related to Your Interaction with Zigpoll and the Offerings and communicating the Offerings.**

**Registration and Contact Information.** We collect information about you when you (a) register to use the Services and (b) otherwise provide contact information to us via email, mail, or through our Offerings. This information you provide may include your username, first and last name, email address, mailing address or phone number.

**Payment Information.** When you purchase the Services, we will also collect transaction information, which may include your credit card information, billing and mailing address, and other payment-related information (" **Payment Information**"). We describe how Payment Information may be collected and processed in Section 4.

**Other Information.**We may collect other information from you that is not specifically listed here. We may use any such information in accordance with this Privacy Policy or as otherwise permitted by you.

**Legal Basis.**Our Legitimate Interest. Zigpoll products work together to help sales, marketing, and support teams better communicate with customers. In order to engage visitors and leads we have a legitimate interest to collect relevant data and send messages based on this information. We consider your privacy and data protection rights when we pursue our legitimate interests and ensure that the way our Offerings work don't impact on those rights. For website visitors Zigpoll will store this data for 9 months, for sales and marketing leads Zigpoll will store this data until the individual opts out or where they have not engaged with Zigpoll in 24 months.

**B. Customer Data.**

You may submit various types of information and data into the Services for hosting and processing purposes ("**Customer Data**"). Customer Data may include, without limitation, (a) billing information, personal information such as names, email addresses, phone numbers, location and photos of your end user customers, potential customers and other users of and visitors to your websites, apps and other properties (e.g. Teammates' details ("**People**"), which information may be input into the Services by you or collected by the Services using Zigpoll tags, scripts and other code implemented on such properties, and (b) information contained in communications between you and People using the messaging features of the Services.

**Legal Basis.**We process and store Customer Data to perform our Customer Agreement with you. Without this information, we wouldn't be able to provide our Offerings to you. We also process Customer Data to pursue our legitimate interests by ensuring the smooth running of your Customer Agreement and to help your sales, marketing, and support teams better communicate with your customers. We consider your privacy and data protection rights when we pursue our legitimate interests and ensure that the way Offerings work don't impact on those rights.

# How We Use the Information We Collect

We use your information in the following ways:

To provide, maintain and improve the Offerings and our other products and services, including to operate certain features and functionality of the Offerings (for example, by remembering your information so that you will not have to re-enter it during this or subsequent visits);

To process your inquiries and otherwise deliver customer service;

To process your payments, we share and use Payment Information as described in Section 4 (Payment Information);

To control unauthorized use or abuse of the Offerings and our other products and services, or otherwise detect, investigate or prevent activities that may violate our policies or be illegal;

To analyze trends, administer or optimize the Offerings, monitor usage or traffic patterns (including to track users' movements around the Offerings) and gather demographic information about our user base as a whole;

To communicate directly with you, including by sending you newsletters, promotions and special offers or information about new products and services. Your opt-out options for promotional communications are described in Section 6 (Your Controls and Choices);

In the manner described to you at the time of collection or as otherwise described in this Privacy Policy.

## Sharing Your Information with Third Parties

We do not sell, trade, share or transfer your personal information to third parties except in the following limited circumstances:

We may share your personal information with our parent companies, subsidiaries and affiliates;

We may share your personal information with third-party service providers to permit such parties to provide services that help us with our business activities, which may include assisting us with marketing, advertising our product/service offerings, or providing, maintaining and improving the features and functionality of the Offerings, among other things. For example, we may provide personal information to our service providers for direct emailing of our newsletters or notifications of our product/service offerings. The data shared can include name, job title, email address, message history, company information. All third parties are engaged under contract and obliged to meet appropriate security requirements and comply with all applicable legislation;

We may share your personal information when we have a good faith belief that access, use, preservation or disclosure of such information is reasonably necessary to (a) satisfy any applicable law, regulation, legal process or enforceable governmental request, (b) enforce a Customer

Agreement, including investigation of potential violations thereof, or (c) protect against imminent harm to our rights, property or safety, or that of our users or the public as required or permitted by law;

We may share your personal information with third parties (including our service providers and government entities) to detect, prevent, or otherwise address fraud or security or technical issues;

We may share your personal information with our business partners who offer a service to you jointly with us, for example when running a cross-promotion;

We may share your Payment Information to process your payments, as further described in Section 4 (Payment Information);

We may share and/or transfer your personal information if we become involved in a merger, acquisition, bankruptcy, or any form of sale of some or all of our assets; and

We may share your personal information with a third party if we have your consent to do so. We may also share aggregated or anonymized information with third parties for other purposes. Such information does not identify you individually, but may include usage, viewing and technical information such as the types of Offerings our customers and users generally use, the configuration of their computers, and performance metrics related to the use of Offerings which we collected through our technology. If we are required under applicable law to treat such information as personal information, then we will only disclose it as described above. Otherwise we may disclose such information for any reason.

## Payment Information

When you make a purchase on the Offerings, any credit card information you provide as part of your Payment Information is collected and processed directly by our payment processor Stripe through their Stripe Checkout service. We never receive or store your full credit card information. Stripe commits to complying with the Payment Card Industry Data Security Standard (PCI-DSS) and using industry standard security. Stripe may use your Payment Information in accordance with their own Privacy Policy here: https://stripe.com/us/checkout/legal.

## Other Access to or Disclosure of Your Information

The Offerings may also contain links to third party websites. This Privacy Policy applies solely to information collected by us. Even if the third party is affiliated with us through a business partnership or otherwise, we are not responsible for the privacy practices of such third party. We encourage you to familiarize yourself with the privacy policies of such third parties to determine how they handle any information they separately collect from you. Please be aware that we do not warn you when you choose to click through to another website when using the Offerings.

The Websites contain features that enable you to post reviews, comments or other content that is publicly viewable. You should be aware that any personal information you submit as part of those posts can be read, collected, or used by other visitors to the Websites, and could be used to send you unsolicited messages. We are not responsible for the personal information you choose to publicly post on the Websites.

## Your Rights and Choices

**Opt-Outs.** We may provide you with the opportunity to "opt-out" of having your personal information used for certain purposes when we ask for this information. If you decide to opt-out, we may not be able to provide certain features of the Offerings to you.

**Communication Preferences.** If you no longer wish to receive our newsletter and promotional communications, you may opt-out of receiving them by following the instructions included on such communications or on the Offerings. Please note, however, that you may be unable to opt-out of certain service-related communications.

**Blocking Cookies.** You can remove or block certain cookies using the settings in your browser but the Offerings may cease to function properly if you do so.

**How We Respond to Do Not Track Signals.** Your Web browser may have a "do not track" setting which, when enabled, causes your browser to send a do not track HTTP header file or "signal" to each site you visit. At present, the Offerings do not respond to this type of signal.

**Data Subject Rights.** You can access, rectify, erase, restrict or export your personal information at any time by emailing us at support@zigpoll.com. You can object to our processing of your personal information at any time. Contact our Data Protection Officer with requests or concerns at support@zigpoll.com. If you are unsatisfied with the response you have the right to lodge a complaint with your supervisory authority.

## Accessing and Updating Your Personal Information

When you use the Offerings, we make good faith efforts to provide you with access to your personal information upon your request and either provide you the means to correct this information if it is inaccurate or to delete such information at your request if it is not otherwise required to be retained by law or for legitimate business purposes. You may access, review, correct, update, change or delete your information at any time. To do so, please contact us at support@zigpoll.com with your name and the information requested to be accessed, corrected or removed, or if you are using the Service, sign in to your account, go to your profile, and make the desired changes. We may decline to process requests that are unreasonably repetitive or systematic, require disproportionate technical effort (for instance, requests concerning information residing on backup tapes), jeopardize the privacy of others,

would be extremely impractical, or for which access is not otherwise required. In any case where we provide information access and correction, we perform this service free of charge, except if doing so would require a disproportionate effort.

Please note that if you cease using the Service or we terminate your access to the Service in accordance with your Customer Agreement, you may no longer have the ability to access or update your information.

We may retain your information as necessary to support the Offerings, comply with our legal obligations or resolve disputes. Note that content you post may remain on the Offerings even if you cease using the Offerings or we terminate your access to the Offerings.

## Changes to the Privacy Policy

We reserve the right to change our Privacy Policy at any time. If we make changes, we will post them and will indicate on this page the policy's new effective date. If we make material changes to this policy, we will notify you by email or through notice on the Offerings.

## No Children Under Age 16

The Offerings are not intended for use by anyone under the age of 16, nor does Zigpoll knowingly collect or solicit personal information from anyone under the age of 16. If you are under 16, you may not attempt to register for the Offerings or send any information about yourself to us, including your name, address, telephone number, or email address. In the event that we confirm that we have collected personal information from someone under the age of 16 without verification of parental consent, we will delete that information promptly. If you are a parent or legal guardian of a child under 16 and believe that we might have any information from or about such child, please contact us at the email or mailing address provided at the end of this Privacy Policy.

## Security

The security of your personal information is important to us. We maintain a variety of appropriate technical and organizational safeguards to protect your personal information. We limit access to personal information about you to employees who we believe reasonably need to come into contact with that information to provide products or services to you or in order to do their jobs. Further, we have implemented reasonable physical, electronic, and procedural safeguards designed to protect personal information about you. When you enter sensitive information (such as your password), we encrypt that information in transit using industry-standard Transport Layer Security (TLS) encryption technology. No method of transmission over the Internet, method of electronic storage or other

security methods are one hundred percent secure. Therefore, while we strive to use reasonable efforts to protect your personal information, we cannot guarantee its absolute security.

## Contact Us

If you have questions or need to contact us about this Privacy Policy, please email us at support@zigpoll.com.

## Acceptable Use Policy

Effective day 2 April 2019

This Acceptable Use Policy applies to Zigpoll's (a) websites (including without limitation www.zigpoll.com, www.zigpoll.com, app.zigpoll.com, app.zigpoll.com and any successor URLS, mobile or localized versions and related domains and subdomains) and (b) communications and messaging products and services ((a) and (b) collectively, "Services"). To keep the Services running safely and smoothly, we need our users to agree not to misuse them. Specifically, you agree not to:

a) probe, scan, or test the vulnerability of any system or network used with the Services;

b) tamper with, reverse engineer or hack the Services, circumvent any security or authentication measures of the Services or attempt to gain unauthorized access to the Services (or any portion thereof) or related systems, networks or data;

c) modify or disable the Services or use the Services in any manner that interferes with or disrupts the integrity or performance of the Services or related systems, network or data;

d) access or search the Services by any means other than our publicly supported interfaces, or copy, distribute, or disclose any part of the Service in any medium, including without limitation by any automated or non-automated "scraping";

e) overwhelm or attempt to overwhelm our infrastructure by imposing an unreasonably large load on the Services that consume extraordinary resources, such as by: (i) using "robots," "spiders," "offline readers" or other automated systems to send more request messages to our servers than a human could reasonably send in the same period of time using a normal browser; or (ii) going far beyond the use parameters for any given Service as described in its corresponding documentation;

f) solicit any users of our Services for commercial purposes;

g) use the Services to generate or send unsolicited communications, advertising or spam, or otherwise cause Zigpoll to become impaired in its ability to send communications on its own or on its customers' behalf (e.g., by causing Zigpoll to become registered on any Email DNS

blacklist or otherwise be denied services by any other third party communications service provider);

h) misrepresent yourself or disguise the origin of any data, content or other information you submit (including by "spoofing", "phishing", manipulating headers or other identifiers, impersonating anyone else, or falsely implying any sponsorship or association with Zigpoll or any third party) or access the Services via another user's account without their permission;

i) use the Services for any illegal purpose or in violation of any laws (including without limitation data, privacy and export control laws);

j) use the Services to violate the privacy of others, or to collect or gather other users' personal information (including account information) from our Services;

k) use the Services to stalk, harass, bully or post threats of violence against others;

l) submit (or post, upload, share or otherwise provide) data, content or other information that (i) infringes Zigpoll's or a third party's intellectual property, privacy or other rights or that you don't have the right to submit (including confidential or personal information you are not authorized to disclose); (ii) that is deceptive, fraudulent, illegal, obscene, defamatory, libelous, threatening, harmful to minors, pornographic, indecent, harassing, hateful, religiously, racially or ethnically offensive, that encourages illegal or tortious conduct or that is otherwise inappropriate in Zigpoll's discretion; (iii) contains viruses, bots, worms, scripting exploits or other similar materials; or (iv) that could otherwise cause damage to Zigpoll or any third party;

m) promote or advertise products or services other than your own without appropriate authorization;

n) use meta tags or any other "hidden text" including Zigpoll's or our suppliers' product names or trademarks; or

o) permit or encourage anyone else to commit any of the actions above.

Without affecting any other remedies available to us, Zigpoll may permanently or temporarily terminate or suspend a user's account or access to the Services without notice or liability if Zigpoll (in its sole discretion) determines that a user has violated this Acceptable Use Policy.

# Service Level Agreement

Effective day 2 April 2019

This Zigpoll Service Level Agreement ("SLA") accompanies the Zigpoll Subscription Terms of Service, available at https://zigpoll.com/terms-of-service or a successor URL (the "Agreement") entered into between you ("Customer") and Zigpoll. Capitalized terms used in this SLA that are not defined herein have the meanings given to them in the Agreement.

a) **Target Availability.** Zigpoll will use commercially reasonable efforts to make each Service available with an uptime of 99.8% of each calendar month ("Target Availability").

a) **Exclusions.** The calculation of uptime will not include unavailability to the extent due to: (a) use of the Service by Customer in a manner not authorized in this Agreement or the applicable Documentation; (b) general Internet problems, force majeure events or other factors outside of Zigpoll's reasonable control; (c) Customer's equipment, software, network connections or other infrastructure; (d) third party systems, acts or omissions; or (e) Scheduled Maintenance or reasonable emergency maintenance.

a) **Scheduled Maintenance.** "Scheduled Maintenance" means Zigpoll's scheduled routine maintenance of the Services for which Zigpoll notifies Customer at least twenty-four (24) hours in advance. Scheduled Maintenance will not exceed eight (8) hours per month. Zigpoll typically performs Scheduled Maintenance once per month.

a) **Remedy for Failure to Meet Target Availability.** If there is a verified failure of a Service to meet Target Availability in two (2) consecutive months, then Customer may terminate the applicable Subscription Term by sending written notice of termination within thirty (30) days after the end of the second such month, in which case Zigpoll will refund to Customer any fees Customer has pre-paid for use of such Service for the terminated portion of the applicable Subscription Term. This termination and refund right is Customer's sole and exclusive remedy, and Zigpoll's sole and exclusive liability, for Zigpoll's failure to meet the Target Availability.

## Data Processing Addendum

To see our full DPA, please **click here**.

# Start surveying for free.

Try our no-code surveys that visitors actually answer.

GET STARTED    SEE EXAMPLES

## Questions or Feedback?

We are always ready to hear from you.

**LET'S TALK**

⭘ **Zigpoll**

**Product**

Examples

Pricing

Reviews

Log In

Sign up

**Solutions**

E-Commerce

Media

SaaS

Case Studies

Resources

**Information**

Blog

Terms

DPA

Docs

Affiliates

Integrations

**Company**

About

Contact Us

FAQs

© Zigpoll 2025. All Rights Reserved.