# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

DANA MANZA, individually and on behalf of all others
similarly situated,

                    Plaintiff,                    OPINION and ORDER

    v.                                         24-cv-690-jdp

PESI, INC,

                    Defendant.

---

Defendant Pesi, Inc. sells videos related to various healthcare topics. Plaintiff Dana Manza purchased videos from Pesi, including one on sex therapy. Manza alleges that Pesi disclosed her purchasing history and other personal information to social media companies and data brokers without her consent. She contends that Pesi violated the Video Privacy Protection Act (VPPA), and she seeks to represent four sub-classes of consumers whose information was disclosed to Meta, Google, Pinterest, or a data broker.

Pesi moves to dismiss for failure to state a claim upon which relief may be granted. Dkt. 15. Pesi contends that the VPPA does not apply to either Pesi or the information that Manza alleges was disclosed. Alternatively, Pesi says that Manza's allegations are not sufficiently detailed to support a VPPA claim. The court rejects all of these contentions and will deny the motion to dismiss.

ANALYSIS

Manza's claims arise under the Video Privacy Protection Act (VPPA), which prohibits any "videotape service provider" from "knowingly disclos[ing]" to a third party "personally identifiable information concerning any consumer." 18 U.S.C. § 2710(1)(b). There are several

exceptions to the rule against disclosure, including for law enforcement, compliance with court orders, or if the consumer gives consent. *Id.* § 2710(b)(2)(A)–(F). Any person aggrieved by a violation may bring a civil action for damages. *Id.* § 2710(c).

Manza contends that Pesi is violating the VPPA in two ways: (1) by providing Meta, Google, and Pinterest her purchasing history and personally identifiable information so they can show her targeted advertising; (2) by selling her purchasing history and personally identifiable information to data brokers, such as NextMark, Inc. Pesi moves to dismiss all of Manza's claims, and Pesi's arguments can be grouped into three categories: (1) Pesi is not a "videotape service provider" within the meaning of the VPPA; (2) much of the information alleged to be disclosed is not "personally identifiable information" within the meaning of the VPPA; and (3) Manza's allegations are not sufficiently detailed to satisfy federal pleading standards.

On a motion to dismiss, the question is whether the plaintiff has provided fair notice and stated a plausible claim for relief, which means that the allegations in the complaint raise a right to relief above the speculative level. *McCray v. Wilkie*, 966 F.3d 616, 620 (7th Cir. 2020). Stated another way, the plaintiff must "present a story that holds together" under the relevant law. *Taylor v. Salvation Army National Corporation*, 110 F.4th 1017, 1028 (7th Cir. 2024). The court concludes that Manza's allegations meet that standard.

## A.  Video tape service provider

The VPPA was enacted in the 1980s, so its focus is on "video tapes." But the statute is not limited to that medium. It defines "video tape service provider" to mean "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes *or similar audio visual materials*."

2

18 U.S.C. § 2710(a)(4) (emphasis added). Pesi admits that it sells prerecorded audiovisual materials within the meaning of § 2710(a)(4). A primary feature of Pesi's website is the sale of prerecorded video courses and seminars on various healthcare topics.[1] *See Berryman v. Reading International, Inc.*, No. 24 Civ. 750, — F. Supp. 3d —,  2025 WL 315403, at *3 (S.D.N.Y. Jan. 28, 2025) ("video tape service provider" includes "websites and streaming services that deliver online video content to consumers").

Pesi argues that it does not qualify as a video tape service provider because it is a nonprofit organization, so it is not "engaged in the business" of selling videos. The VPPA does not define the phrase "engaged in the business," and the parties cite no other case that has interpreted that portion of the statute, so the court will conduct its own analysis.

When a term is not defined by the statute, the court may look to a term's ordinary meaning as reflected in dictionaries. *See Hall v. U.S.*, 566 U.S. 506, 511–12 (2012); *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7–8 (2011). Dictionary definitions of "business" include references to profit seeking, but they are not limited to such ventures. For example, Black's Law Dictionary (12th ed. 2024) defines "business" to mean "[a] commercial enterprise carried on for profit," but also as "a particular occupation or employment habitually engaged in for livelihood or gain," and more simply "[c]ommercial enterprises." Black's further states that "business includes every trade, occupation, and profession." This is consistent with other dictionaries that define "business" to include profit-seeking ventures but also other

---

[1] *See* https://www.pesi.com/.

commercial enterprises.[2] Applying definitions like these, one federal court held that a nonprofit organization was "engaged in the business" of selling media for the purpose of a state privacy statute because the organization made regular magazine sales to help sustain itself. *Krassick v. Archaeological Institute of America*, No. 21-cv-180, 2022 WL 2071730, at *8 (W.D. Mich.  June 9, 2022); *see also Steel Joist Institute, Inc. v. J. H. Mann, III, Inc.*, 171 So.2d 625, 627–28 (Fla. Ct. App. 1965) ("A non-profit corporation's business is whatever functions it has been organized to perform.").

It is reasonable to infer from the allegations in the amended complaint that Pesi regularly sells videos on its website, and it does so to help sustain the organization. That is enough at the pleading stage to conclude that Pesi is "engaged in the business" of video sales.

Even if the phrase "engaged in the business" were ambiguous, Pesi points to no statutory purpose that would be served by applying the VPPA to for-profit businesses only, and it does not cite any legislative history suggesting that nonprofit organizations were meant to be excluded. So the court declines to read in Pesi's proposed limitation. It seems more likely that that phrase was included in the statute to ensure that individuals could not be held liable when they conducted personal transactions, such as loaning a video to a friend or selling it at a garage sale.

---

[2] *See, e.g.*, *Business*, Merriam-Webster, https://www.merriam-webster.com/dictionary/business ("a usually commercial or mercantile activity engaged in as a means of livelihood" and "a commercial or sometimes an industrial enterprise"); *Business*, Oxford English Dictionary, https://www.oed.com/dictionary/ business_n?tl=true#11687723 ("Trade and all activity relating to it, esp. considered in terms of volume or profitability; commercial transactions, engagements, and undertakings regarded collectively; an instance of this. Hence more generally: the world of trade and commerce."); *Business*, Cambridge Dictionary https://dictionary. cambridge.org/us/dictionary/english/business ("the activity of buying and selling goods and services, or a particular company that does this, or work in general rather than pleasure").

Pesi cites case law and IRS guidance to support a profit-seeking requirement, but none of the authority Pesi cites is instructive. In *United States v. Gross*, the defendant was convicted of dealing in firearms without a license under 18 U.S.C. § 922(a)(1). 451 F.2d 1355, 1356 (7th Cir. 1971). The defendant argued that § 922(a)(1) was unconstitutionally vague because it did not adequately define what qualifies as "dealing." The court rejected that argument, looking to the statutory of definition of "dealer," which was "any person engaged in the business of selling firearms or ammunition at wholesale or retail." *Id.* at 1357. Citing *Stone v. District of Columbia*, 198 F.2d 601, 603 (D.C. Cir. 1952), the court stated that "'business' is that which occupies time, attention and labor for the purpose of livelihood or profit." *Id.*

*Gross* does not help Pesi for two reasons. First, the court of appeals was not considering whether "engaged in the business" encompasses nonprofit organizations, so it does not provide guidance on that issue. Second, even if the court were to apply *Gross*'s definition of "engaged in the business" in this case, that definition does not exclude nonprofit organizations. That definition includes activities for profit *or* livelihood, and "livelihood" is "[a] means of supporting one's existence, esp. financially." *Livelihood*, Black's Law Dictionary (12th ed. 2024). It is reasonable to infer that Pesi uses video sales to help support itself. In its reply brief, Pesi says that "livelihood" implies that "Pesi's survival on the most basic level is dependent on its sale of prerecorded videos," and Manza has not alleged that. But the definition of "livelihood" encompasses "a" means of support, not just "the" means of support, so Pesi's argument is not persuasive.

Pesi cites two other cases: *Securities and Exchange Commission v. Long*, No. 23 C 14260, 2024 WL 3161669 (N.D. Ill. June 25, 2024), and *Svithiod Singing Club v. McKibbin*, 44 N.E.2d 904 (Ill. 1942). Like *Gross*, these cases did not determine whether a nonprofit organization can

"engage in business." *Long* held that securities traders can engage in "the business of buying and selling securities" even if they buy or sell securities only for themselves. *Svithiod* held that a social club was not subject to a tax for "engaging in the business of selling . . . tangible personal property at retail" because "[t]he serving of food and drinks [was] an incidental accommodation to [the club's] members," and not the purpose of the club. These holdings have no bearing on the correct interpretation of the VPPA.

Pesi also says that its status as a nonprofit means that it cannot operate as a business because it is "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, educational, or other specified purposes." Dkt. 16, at 7 (quoting IRS, "Exempt organization types," https://www.irs.gov/charities-non-profits/exempt-organization-types). The VPPA is not a tax statute, and Pesi identifies no reason why the VPPA should be construed in light of IRS guidance. In any event, the guidance Pesi cites does not purport to define what it means to "engage in business," so it does not support Pesi's position.

The court concludes that it is reasonable to infer from the amended complaint that Pesi is a video tape service provider within the meaning of the VPPA.

## B. Personally identifiable information

Manza is suing Pesi for disclosing different types of information with her purchase history to third parties. This includes not just her name and address, but also unique identifiers associated with her accounts on Meta, Google, and Pinterest. Manza alleges that Pesi uses tracking technology provided by those social media companies so that a Pesi customer's video purchase is disclosed to those companies if the customer has an account with that company. Dkt. 13, ¶¶ 4, 16–22. For example, Manza alleges that Pesi uses a program called Meta Pixel that sends to Meta the title of the video that the customer purchased, along with the customer's

6

Facebook ID, which is a sequence of numbers assigned only to that Meta accountholder. *Id.*, ¶¶ 5, 65–95. Manza also alleges that Pesi uses similar technology from Google (Google Analytics and Google Tag Manager) and Pinterest (Pinterest Tag) so that video titles and identifiers unique to the customer, such as client IDs and user IDs, are disclosed when a Pesi customer with a Google or Pinterest account makes a video purchase from Pesi. *Id.*, ¶¶ 6–7, 96–113. Manza alleges that the social media companies then use the information to target the customer with specialized ads based on the customer's video purchases. *Id.*, ¶¶ 67, 69, 89, 106.

The parties dispute whether the ID numbers qualify as "personally identifiable information" (PII).[3] The VPPA does not include a definition of the term. Instead, the VPPA states that "personally identifiable information *includes* information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3) (emphasis added). In arguing that customer IDs are not PII, Pesi relies on a test first articulated by the Court of Appeals for the Third Circuit, which is whether the disclosed information "would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits." *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 284 (3d Cir. 2016). Pesi says that Manza's amended complaint does not include plausible allegations that an ordinary person could identify her purchases from her ID numbers, so any claim based on disclosure of those numbers fails. Manza contends that

---

[3] In addition to ID numbers, Manza alleges that Pesi disclosed IP addresses and hashed email addresses. Dkt. 13, ¶¶ 18, 98–104. The court concludes that the ID numbers qualify as personally identifiable information, so it is not necessary at this stage of the case to consider whether that other information also qualifies. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (court may not dismiss part of a claim on motion to dismiss).

the "ordinary person" test is wrong, but even if it is correct, she adequately pleaded that an ordinary person could use the ID numbers to identify her.

The Court of Appeals for the Seventh Circuit has not considered the meaning of PII under the VPPA. The Ninth Circuit and the Second Circuit have adopted the Third Circuit's "ordinary person" test. *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017); *Solomon v. Flipps Media, Inc.*, No. 23-7597-cv, — F.4th —, 2025 WL 1256641, *9 (2d Cir. May 1, 2025). The First Circuit held that the question is whether the "information reasonably and foreseeably [is] likely to reveal which" videos the customer acquired. *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). In a decision that came out a few weeks before *Solomon*, the Southern District of New York also rejected the "ordinary person" test. *Lee v. Springer Nature America, Inc.*, No. 24-cv-4494, — F. Supp. 3d —, 2025 WL 692152, at *15 (S.D.N.Y. Mar. 4, 2025). The court did not expressly adopt a test, but it identified a possibility: information that is "closely associated with a unique individual and can be used to trace the individual." *Id.* at *10.[4]

Courts applying each of the above approaches agree that PII includes more than just information that, on its face, shows that a particular individual obtained a particular video. The courts reason that the inclusion of the suffix 'able' in "personally identifiable information" implies that the information *can be used* to identify a person, not just that it identifies a person on its own. *Solomon*, 2025 WL 1256641, at *9; *Eichenberger*, 876 F.3d at 984; *Yershov,* 820 F.3d

---

[4] The disclosed information at issue in *Nickelodeon* included IP addresses, user "browser and operating system settings," and "a computing device's 'unique device identifier,'" 827 F.3d at 281–82; in *Eichenberger*, it was device serial numbers, 876 F.3d at 979; in *Yershov* it was GPS coordinates, 820 F.3d at 486; and in *Solomon* and *Lee* it was Facebook ID numbers, *Solomon*, 2025 WL 1256641, at *1, and *Lee*, 2025 WL 692152, at *10.

8

at 486 *Lee,* 2025 WL 692152, at *10. This court agrees. If the rule were otherwise, little if any information would be covered by the statute. Physical addresses, phone numbers, and Social Security numbers do not identify a person on their face, but they can be *used* to identify the person. *Yershov*, 820 F.3d at 486; *Lee*, 2025 WL 692152, at *11. Even a name may be ambiguous because most names are not unique, so it follows that information may qualify as PII even if it must be combined with other information to identify the individual. This understanding of PII is consistent with *Dahlstrom v. Sun-Times Media, LLC*, in which the court construed the phrase "information that identifies an individual" in the Driver's Privacy Protection Act to include age, height, weight, hair color, and eye color because those characteristics "indisputably aid[] in identifying" an individual, even if they would not be sufficient on their own. 777 F.3d 937, 943 (7th Cir. 2015).

So PII includes "not just information that, by itself, identifies a consumer's video-viewing history, but also information capable of being used to do so." *Solomon*, 2025 WL 1256641, at *9. The question is: capable of being used by whom? Is it limited to the "ordinary person" or a broader group? To answer that question, the court must begin with the statutory text. *Dahlstrom*, 777 F.3d at 943.

The VPPA itself does not place a specific limit on the type of person who can identify a customer's video purchases. And the use of the word "includes" in the provision on PII supports a broad reading of the term, as even some of the courts adopting an "ordinary person" standard have acknowledged. *See Nickelodeon*, 827 F.3d at 290. Terms like "includes" are "typically illustrative and not limitative." *Dahlstrom*, 777 F.3d at 943.

Information qualifies as PII under the VPPA if it can be used to "identif[y] a person as having requested or obtained specific video materials or services from a video tape service

9

provider." 18 U.S.C. § 2710(a)(3). Under the plain language of the statute, it does not matter who is doing the identifying or how they are doing it, so long as the video tape service provider *knows* that the information can be used by a third party to identify a specific person. *Id.*, § 2710(1)(b) (VPPA applies only when the video tape service provider "knowingly discloses" PII). Under this view, information that uniquely identifies a customer to a third party can qualify as PII, regardless of whether the third party is an "ordinary person" or a social media company. So disclosures of a customer's video purchases paired with an ID number can qualify as PII. In this context, there is little difference between an ID number and a Social Security number, which is generally understood to qualify as PII. *See Lee,* 2025 WL 692152, at *10. Both are numbers that are uniquely associated with one person, and both need to be paired with other information to identify an individual. *Id.* at *14.

The courts that have adopted the "ordinary person" standard have identified little textual basis for the limitation they impose.[5] *Solomon* acknowledged that the plain language of the VPPA was broad enough "to encompass computer code and digital identifiers," but the court concluded that the statute is "more naturally read as referring to information that would permit an ordinary person to learn another individual's video-watching history," 2025 WL 1256641, at *9, without explaining why.

*Solomon* and *Eichenberger* cite the VPPA's "knowingly discloses" element in support of an "ordinary person" test on the ground that the phrase is evidence that "the statute views disclosure from the perspective of the disclosing party. It looks to what information a video

---

[5] *Yershov*, 820 F.3d 482, has a similar problem because it does not explain the textual basis for its "reasonably and foreseeably" standard, which appears to add little to the "knowingly discloses" element that of the VPPA. Regardless, Pesi does not rely on *Yershov*, so it is not necessary to discuss it further.

service provider discloses, not to what the recipient of that information decides to do with it."
*Eichenberger*, 876 F.3d at 985; *Solomon*, 2025 WL 1256641, at *9. This court agrees that the
phrase "knowingly discloses" puts the focus on what the video tape service provider knows. But
neither *Solomon* nor *Eichenberger* explain how that conclusion supports an "ordinary person" test.
In fact, the "ordinary person" standard itself focuses on the recipient in some sense because
the standard turns on what an "ordinary person" could do with the disclosed information rather
than on the nature of the information itself. Regardless, the VPPA's intent element does not
inform the meaning of PII. The intent element places a limitation on when a video tape service
provider can be held liable for disclosing PII; the element does not explain what PII *is*.

Rather than rely on the text, the courts adopting an "ordinary person" test have
concluded that the meaning of PII is ambiguous in the VPPA, and they rely on other tools of
statutory construction to support a narrower reading. *See, e.g.*, *Nickelodeon*, 827 F.3d at 284. But
the reasons they provide are not persuasive.

First, they say that a narrower interpretation is supported by legislative history and the
purpose of the VPPA. For example, *Nickelodeon* quotes extensively from congressional
committee reports. *See* S. Rep. No. 100-599 (1988) (Senate Report); Video and Library Privacy
Protection Act of 1988: Hearing on H.R. 4947 & S. 2361 Before the Subcomm. on Courts,
Civil Liberties & the Admin. of Justice of the H. Comm. on the Judiciary & the Subcomm. on
Tech. & the Law of the S. Comm. on the Judiciary, 100th Cong. (1988). But there are no
references to the "ordinary person" standard or anything similar in those reports. Rather, the
reports include statements from legislators and advocates regarding the importance of

11

protecting privacy even as technology changes.[6] The Senate Report also includes a statement of purpose:

> The Act allows consumers to maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers. The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent.

Senate Report, at 8. *Nickelodeon* does not explain how anything in the legislative history supports a narrow reading of the statute. If anything, the text, purpose, and history of the statute suggest that Congress intended the meaning of PII to be expansive so that it could adapt to changing technology. Even *Nickelodeon* acknowledged that there was support for such a view. *See* 827 F.3d at 285 ("[T]here are portions of the legislative history that might be read to support . . . a view [that] Congress intended to pass a broad statute that would protect consumer privacy even as video-watching technology changed over time.").

Second, *Nickelodeon*, *Solomon*, and *Eichenberger* focused on the specific impetus for the VPPA—a reporter's disclosure of Judge Robert Bork's video tape rental history—and the state of technology in 1988. *Nickelodeon* stated that it did "not think that, when Congress passed the [VPPA], it intended for the law to cover factual circumstances far removed from those that motivated its passage." 827 F.3d at 284. *Solomon* and *Eichenberger* stated that, in 1988, "Internet

---

[6] *See, e.g.*, Senate Report, at 6–7 ("The advent of the computer means not only that we can be more efficient than ever before, but that we have the ability to be more intrusive than ever before. Every day Americans are forced to provide to businesses and others personal information without having any control over where that information goes.") (statement of Senator Simon); *id.* at 7–8 ("These precious rights have grown increasingly vulnerable with the growth of advanced information technology. The new technologies not only foster more intrusive data collection, but make possible increased demands for personal, sensitive information. Private commercial interests want personal information to better advertise their products.") (statement of the ACLU).

had not yet transformed the way that individuals and companies use consumer data." *Solomon*, 2025 WL 1256641, at *9; *Eichenberger*, 876 F.3d at 985. Neither of these observations is a reason to interpret the VPPA narrowly. "[S]tatutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 79 (1998). The question is not whether Congress had a plaintiff's specific problem in mind when it enacted the statute, but whether the statute uses language broad enough to cover the problem. This court has concluded that it does.

Third, *Nickelodeon* and *Solomon* reviewed other statutes that include definitions of PII. They focused on the Children's Online Privacy Protection Act (COPPA) in particular, noting that the definition of PII in that statute is a discrete list of items and that the Federal Trade Commission may add more items, one of which is "[a] persistent identifier, such as a customer number held in a cookie or a processor serial number, where such identifier is associated with individually identifiable information." *Nickelodeon*, 827 F.3d at 287. *Nickelodeon* observed that the VPPA "does not empower an administrative agency to augment the definition of 'personally identifiable information' in light of changing circumstances or new technologies. The meaning of that phrase in the Act is, it would appear, more static." *Id. Solomon* made the same point. 2025 WL 1256641, at *10.

Again, the courts did not explain how their observation supported an "ordinary person" standard. "Static" does not mean "narrow." COPPA is not instructive because its definition of PII is a laundry list; VPPA's more general definition does not need to be "updated."

Fourth, *Nickelodeon* and *Solomon* made a similar argument related to Congress's failure to amend the definition of PII when it amended other provisions of the VPPA in 2013. The

courts stated that "Congress's decision to retain the 1988 definition of personally identifiable information indicates that the Act serves different purposes, and protects different constituencies, than other, broader privacy laws." *Solomon*, 2025 WL 1256641, at *10; *Nickelodeon*, 827 F.3d at 288. This argument again rests on the false assumption that the VPPA defines PII narrowly, so it was necessary to amend the statute to keep up with modern technology. But as this court has already explained, the VPPA is already broad enough so that it does not need to be updated.

In any event, the Supreme Court has cautioned against using Congress's failure to amend a statute as evidence of legislative intent. For example, in *Bostock v. Clayton County, Georgia*, the Court rejected the argument that Title VII of the Civil Rights Act should not be construed as prohibiting discrimination based on sexual orientation and gender identity because Congress had repeatedly rejected amendments to Title VII that would make such prohibitions explicit. 590 U.S. 644, 670 (2020). The Court reasoned, "All we can know for certain is that speculation about why a later Congress declined to adopt new legislation offers a particularly dangerous basis on which to rest an interpretation of an existing law a different and earlier Congress did adopt." *Id.* Even if subsequent legislative history were an appropriate basis for statutory interpretation, neither *Nickelodeon* nor *Solomon* cite any legislative reports or other evidence shedding light on why Congress chose not to amend the definition of PII in the VPPA.

Fifth, and finally, *Nickelodeon*, *Solomon,* and *Eichenberger* were concerned about the potential breadth of the VPPA and unfairness to video tape service providers. For example, *Solomon* and *Eichenberger* stated that liability under the VPPA should not turn on "circumstances outside a videotape service provider's control" and that an "ordinary person" standard "better

informs" video tape service providers about their obligations under the act. *Solomon*, 2025 WL 1256641, at *9; *Eichenberger*, 876 F.3d at 985.

This concern is misplaced in two respects. First, the "ordinary person" standard *does* turn on circumstances outside the video tape service provider's control and it does not provide clear guidance to a video tape service provider because it rests on what a hypothetical third party may do with the information it received, and it requires the video tape service provider to speculate on the abilities of an "ordinary person." How computer savvy is the "ordinary person?" What access to information does she have? How motivated is she to obtain that information? These are all questions that a video tape service provider must ask itself under the "ordinary person" standard, and they do not have obvious answers. For example, courts have come to different conclusions about whether an "ordinary person" could identify a video customer using a Facebook ID. *Compare Solomon*, 2025 WL 1256641, at *10–11 *with Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023). In contrast, a test that asks whether the information aids in uniquely identifying the customer is objective and focuses on the nature of the information rather than on speculation about a third party.

Second, concerns about unfairness to video tape service providers are addressed by the VPPA's intent element. A video tape service provider may be held liable only if it "knowingly discloses" PII. The word "knowingly" generally applies to all subsequently listed elements of a statute. *See Flores-Figueroa v. U.S.*, 556 U.S. 646, 650 (2009). So if a video tape service provider is not aware either that it is disclosing certain information *or* that the information it is disclosing can be used to identify an individual's video purchases, the provider did not violate the VPPA.

15

A "knowingly" element excuses innocent or negligent mistakes. *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 832 (7th Cir. 2011).[7]

There is another reason why the "ordinary person" standard is not persuasive, which is that it creates a substantial loophole in the VPPA's coverage and allows easy evasion, at least as the standard is understood by Pesi.[8] Under Pesi's view, a video tape service provider is free to disclose a customer's video purchases to social media companies, data brokers, or anyone else, even when the provider knows that the third party will be able to easily identify the customer, so long as the provider uses a "code" that an "ordinary person" could not decipher. It essentially allows a video tape service provider to "skirt liability under the VPPA . . . by disclosing a unique identifier and a correlated look-up table." *In re Hulu Privacy Litigation*, No. C 11–03764, 2014 WL 1724344, at *11 (N.D. Cal. Apr. 28, 2014). The only difference is that the third parties in this case already possess the "look-up table" because they know what the customer's ID number is. Applying this logic to the Judge Bork case would mean that the video

---

[7] Pesi does not contend that Manza failed to plead a knowing disclosure, so the court need not consider that issue.

[8] The court refers specifically to Pesi's understanding of the "ordinary person" standard because there are different ways to interpret the standard. For example, the standard could be referring to an ordinary person in the abstract, so that the person would only have access to the same information as any other ordinary person. That seems to be the view of the *Solomon* court, which held that a Facebook ID number combined with a video purchase did not qualify as PII, even when that information was disclosed to Meta, because an ordinary person would not know which person the ID number corresponded to. 2025 WL 1256641, at *10–11. Or the standard could be referring to an ordinary person who possesses all the information the actual recipient possesses, and the question is whether the ordinary person would be able to use that information to identify the customer's video purchases. That may be the view of the *Nickelodeon* court, which focused on the recipient's *technical* abilities and suggested in dicta that "customer ID numbers" could qualify as PII. 827 F.3d at 290.

16

store would be free to disclose Judge Bork's rental history so long as the store matched that history with an ID number provided by the reporter instead of with the judge's name.

Pesi's view makes no sense. The purpose of the VPPA is to prevent video tape service providers from disclosing information that allows third parties to identify a customer's video purchases. That purpose is not served by allowing video tape service providers and third parties to knowingly evade the statute by disclosing a customer's identity with a number unknown to the "ordinary person" but known by the recipient. It is rarely the "ordinary person" who is seeking to invade a consumer's privacy. More commonly, it is entities like those discussed in Manza's amended complaint. If the court were to adopt Pesi's view, it would suggest that even Social Security numbers are not PII because an "ordinary person" might not be able to use the number to identify an individual without significant effort. *See In re Vizio, Inc., Consumer Privacy Litigation*, 238 F. Supp. 3d 1204, 1224–25 (C.D. Cal. 2017).

If the text of the VPPA limited the statute's reach to only information that an "ordinary person" could use to identify a consumer, the court would apply the statute as written. But "[t]he 'ordinary person' standard is a judicial construct." *See Lee, 2*025 WL 692152, at *15. It creates a loophole that significantly undermines the basic purpose of the VPPA and is not supported by the VPPA's text, so the court declines to adopt the standard. Instead, the court concludes that ID numbers uniquely associated with a specific customer qualify as PII under the VPPA when they are paired with the names of videos the customer obtained from the defendant.

## C. Plausibility

Pesi's remaining contentions are about whether Manza has pleaded enough information to state a plausible claim under the VPPA. Many of these contentions relate to whether Manza

17

adequately pleaded that an "ordinary person" could identify her through information like ID numbers. The court has rejected the "ordinary person" standard, so those contentions are moot. This leaves the following contentions: (1) Manza has conceded that her internet browser blocked Pesi from disclosing information about her; (2) Manza did not allege that she was signed into Meta, Google, or Pinterest when she made her video purchases from Pesi, so Pesi could not have disclosed Manza's PII to those entities; (3) Manza does not include any of her Meta, Google, or Pinterest ID numbers in her amended complaint, so it is not reasonable to infer that Pesi disclosed that information; (4) Manza did not identify the information she gave to Meta, Google, and Pinterest that would enable them to identify her; and (5) Manza's allegations that Pesi disclosed her name and video purchases to NextMark, Inc. and other data brokers are too conclusory.

The issues Pesi raises may present challenges for Manza at the class certification or summary judgment stages of the case, but they are premature at this stage of the case. The court concludes that Manza's allegations state a plausible claim for relief under the VPPA.

### 1. Whether Manza's blocked Pesi from disclosing information

In its opening brief, Pesi argued that Manza's claims against Meta, Google, and Pinterest fail because Manza admitted in her amended complaint that she uses Mozilla Firefox as her internet browser, and Firefox's default settings block tracking technologies. Dkt. 16, at 8–10. But the allegation in the amended complaint that Pesi cites does not say that Manza uses Firefox as her browser. Rather, the complaint refers to a hypothetical woman who lives in North Carolina (Manza lives in New York). *See* Dkt. 13, ¶ 105. So even if Pesi is correct about how Firefox operates, Manza has not pleaded herself out of court.

18

In its reply brief, Pesi dropped its original argument and instead contended that the court must disregard numerous paragraphs in the amended complaint because Manza has "abandon[ed]" those allegations. Dkt. 30, at 5. This contention rests solely on Manza's statement in her opposition brief that paragraph 105 in the amended complaint was not referring to Manza's personal experience. Specifically, Pesi says that, if paragraph 105 does not apply to Manza, then it must mean that no other "illustrative" allegations apply to Manza, including those that refer to Manza expressly. That is not a reasonable interpretation of the complaint. Paragraph 105 does not refer to Manza, so it implies nothing about allegations that do.

Manza did not "abandon" any of the allegations in the amended complaint, so the court will not disregard the allegations Pesi cites.

### 2. Whether Manza was signed into her social media accounts when she purchased videos from Pesi

Pesi contends that Manza has not stated a claim under the VPPA for disclosures to Meta, Google, and Pinterest because she did not expressly allege that she was logged into her social media accounts when she purchased videos from Pesi. According to Pesi, it cannot share data through Meta Pixel, Google Analytics, Google Tag Manager, or Pinterest Tag unless the customer is signed in to the corresponding social media account.

This argument fails. As an initial matter, the amended complaint does not include any allegations that the tracking technology at issue is effective only when a customer is signed into the relevant social media account. In fact, Manza expressly alleges that one of Google's ID numbers can be shared through Google Analytics even when a customer is not signed in to her Google account. *See* Dkt. 13, ¶ 19 n.4. Generally, a court may not consider facts outside the

complaint when considering a motion to dismiss. Fed. R. Civ. P. 12(d). Pesi does not argue that the court can take judicial notice of its proposed facts, and it does not identify any other basis for considering those facts at this stage of the case.

But even if the court accepts as true that Pesi could not share information with the social media companies unless she was signed into her account, Pesi's argument fails because it rests on the assumption that a complaint must allege every fact that the plaintiff must ultimately prove. That contention has been repeatedly rejected by the Court of Appeals for the Seventh Circuit. *See Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337–38 (7th Cir. 2024); *Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017); *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 517–18 (7th Cir. 2015); *Christensen v. Cnty. of Boone, IL*, 483 F.3d 454, 465–66 (7th Cir. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era."). Pesi cites no authority from this circuit or the Supreme Court suggesting otherwise. The case they do cite, *Martinez v. D2C, LLC*, No. 23-21394-Civ, 2024 WL 4367406 (S.D. Fla. Oct. 1, 2024), was a decision on a motion for class certification, not a motion to dismiss, so it is not instructive.

At the pleading stage, the court must draw all reasonable inferences in favor of the plaintiff. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011). In this case, Manza alleges that she had accounts with Meta, Google, and Pinterest, she purchased a video from Pesi, and Pesi disclosed the title of the video along with her unique identifiers such as her Facebook ID, client ID, and user ID, to the social media companies. Dkt. 13, ¶¶ 16–22. From this, it is reasonable to infer that Manza satisfied any logistical prerequisites to the alleged disclosure,

including being logged into her social media accounts when she made the purchase, if that is in fact a requirement.

### 3. Whether Manza was required to include her ID numbers in her complaint

Pesi contends that Manza cannot state a claim for disclosure of information to Meta, Google, or Pinterest because she did not include in her amended complaint the ID numbers and other unique identifiers that Pesi disclosed. Pesi neither cites any authority for such a requirement nor explains why it is necessary. This would be like requiring a victim of identity theft to include her Social Security number or credit card number in her amended complaint. Manza alleges that she has accounts with Meta, Google, and Pinterest, and she identifies the type of ID numbers that Pesi disclosed. That is enough to support a plausible claim.

### 4. Whether Manza gave Meta, Google, or Pinterest information they could use to identify her

Pesi says that Manza does not identify what personal information she gave to Meta, Google, and Pinterest that would connect her ID numbers to her. It is reasonable to infer even without express allegations that Manza gave the social media companies basic information like her name when she created an account with them.

### 5. Whether Manza's allegations that Pesi disclosed her name and video purchases to NextMark and other data brokers are too conclusory

Most of Manza's allegations relate to her claims about disclosures to the social media companies. But paragraphs 55 through 64 of the amended complaint are about alleged disclosures to data brokers. Manza alleges generally that "Defendant has monetized these databases [of customer PII] by renting, selling, or otherwise disclosing their customers' Personal Viewing Information to data aggregators, data miners, data brokers, data appenders, and other third parties." Dkt. 13, ¶ 55. Manza also provides screenshots from a company called

21

NextMark, Inc. purporting to sell mailing lists for Pesi's "HealthCare Nursing Seminar Attendees" and "Mental Health Seminar Attendees." *Id.*, ¶¶ 57–58.

These allegations are enough, if barely, to state a plausible claim that Pesi sold Manza's PII to a data broker like NextMark. Manza alleges that she purchased a video for a seminar called "Integrative Sex and Couples Certification Training with Tammy Nelson: Certified Sex Therapy Informed Professional (CSTIP)." *Id.*, ¶ 19. At the pleading stage, it is reasonable to infer that NextMark categorized sex therapy as part of "mental health," so a video regarding a seminar on sex therapy could be included on mailing lists for mental health seminars. The screenshot indicates that the mailing lists for mental health seminars include approximately 200,000 people, suggesting that "mental health" is broadly defined. *Id.*, ¶ 58. The screenshot also states that a purchased mailing list can include the customer's "course heading," so it is reasonable to infer that both Manza's name and the name of the video she purchased was disclosed.

Pesi challenges this claim on several grounds: (1) the screenshots do not identify Manza or the videos she purchased; (2) Manza does not expressly allege that she was on a mailing list; (3) some of Pesi's seminars are live rather than prerecorded, and the screenshots do not indicate whether they cover prerecorded seminars; (4) NextMark's website states that NextMark does not sell mailing lists. The court rejects the first three arguments because they would require Manza to plead too much. Again, the court must draw reasonable inferences in Manza's favor. For the reasons explained, it is reasonable to infer that Manza's name and her video purchase are included on the mailing list for mental health seminars. It is also reasonable to infer at the pleading stage that the mailing list includes purchasers of prerecorded material. The screenshots do not say one way or the other whether the seminars were live, prerecorded or both. But it is

22

reasonable to infer that prerecorded seminars are included in light of the large size of the mailing list.

Pesi's last argument is based on statements on NextMark's website that NextMark does not sell mailing lists and that requests for mailing lists will be "routed to the list supplier." Dkt. 16, at 14. Pesi cites no authority for the view that statements on a third-party's website can trump the allegations in the complaint at the pleading stage. But even if the court credits those statements, they do not require dismissal of this claim. NextMark is not a defendant in this case, so it does not matter whether NextMark in particular is the recipient of PII. The question is whether Pesi is selling mailing lists to some third party. Regardless of whether NextMark receives the mailing lists, both the screenshots and the website suggest that mailing lists of Pesi's customers and their purchases do exist, and that some entity is selling them. Neither the amended complaint nor the website states who the "list supplier" is or how the supplier got the lists, but Pesi has the best access to its own customer lists, so it is reasonable to infer at the pleading stage that the lists came from Pesi.

The bottom line is that Pesi seeks to require Manza to plead information that Rule 8 does not require. At this stage, Manza need only raise a right to relief above the speculative level. *McCray*, 966 F.3d at 620. The issues Pesi raises are better resolved in the context of a motion for class certification or summary judgment.

23

ORDER

IT IS ORDERED that defendant Pesi, Inc's motion to dismiss, Dkt. 15, is DENIED.

Entered May 20, 2025.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge