# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN ROBERT GOODMAN, et al.,

       Plaintiffs,

                                     Case No. 1:25-cv-417

v.

                                     Hon. Hala Y. Jarbou

HILLSDALE COLLEGE,

       Defendant.

_____/

**OPINION**

Plaintiffs bring this putative class action against Defendant Hillsdale College ("the College") based on alleged violations of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Plaintiffs claim that the College unlawfully disclosed to third parties the titles of video lectures that Plaintiffs watched on the College's website. (Compl., ECF No. 1.) The College now moves to dismiss for failure to state a claim. (ECF No. 9.) For the reasons explained below, the Court will deny the motion.

**I. BACKGROUND**

Hillsdale College is a nonprofit entity headquartered in Hillsdale, Michigan. (Compl. ¶ 6.) In addition to its physical campus,[1] the College also operates a website (online.hillsdale.edu) that hosts video recordings of educational lectures. (*Id.* ¶¶ 2, 50.) There is no fee to watch the videos, although most are only accessible to users who sign up for a free account. (*Id.* ¶¶ 44, 51, 53.) To sign up for an account, a user must enter their full name and email address. *See Account Sign-Up*,

---

[1] *See Hillsdale College Profile*, https://www.hillsdale.edu/about/college-profile/ [https://perma.cc/M8L8-PYEL].

https://online.hillsdale.edu/signup [https://perma.cc/L5ZS-P2NF].[2]  Plaintiffs allege that the College knowingly operates "trackers" on its website, which record information about its users and transmit that information to companies such as Google, DoubleClick, and X Corp.  (*Id.* ¶¶ 38, 54.)  The College allegedly uses these trackers to, among other things, "augment its advertisements and overall online platform."  (*Id.* ¶ 54.)

Plaintiffs' complaint focuses on the College's alleged use of the "Meta Pixel," a tracker created by Meta Platforms, Inc., the company that operates the social network Facebook.  (*Id.* ¶¶ 22, 54.)  When website operators install the Meta Pixel, they choose what information about their users is collected and transmitted to Meta.  (*Id.* ¶¶ 59–60.)  Plaintiffs alleges that the College implemented a "c_user cookie," which transmits a user's "Facebook ID" to Meta.  (*Id.* ¶ 59.)  A Facebook ID "is a unique sequence of numbers linked to [an] individual's Facebook profile."  (*Id.* ¶ 28.)  If a person enters "facebook.com" into their web browser, followed by a slash and a Facebook ID, they can find the specific Facebook profile associated with that ID.  (*Id.*)

Along with a user's Facebook ID, the College also transmits the URL of the page visited by that user.  (*Id.* ¶ 66.)  The URL generally includes the title of the page: for example, if a user navigates to the page for the College's online course titled "Totalitarian Novels," the Pixel sends Meta the following information:

---

[2] Although the complaint does not specify what information is required to make an account, it links to the account creation page on the website, and the Court can take judicial notice of websites.  *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005).  Furthermore, the College agrees that "all [Plaintiffs] needed to do to gain indefinite access to Hillsdale's full online library of prerecorded lectures is provide a first name, last name, and email address."  (Br. in Supp. 24, ECF No. 10.)

> https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=711322226445334&ev=P
> ageView&dl=https%3A%2F%2Fonline.hillsdale.edu%2Fcourses%2Fpromo%2Ftotalitarian-
> novels&rl=&if=false&ts=1740630825595&sw=1920&sh=1080&v=2.9.184&r=stable&a=tmSim
> o-GTM-WebTemplate&ec=3&o=12318&fbp=fb.1.1738956026667.341932906172499229
> &cs_est=true&ler=empty&cdl=API_unavailable&it=1740630705273&coo=false&tm=1&rqm=F
> GET

(*Id.*)  The URL starts on the second line, and includes the words "totalitarian-novels."

Although the College provides the videos for free, Plaintiffs allege that the videos support the College financially in several ways.  First, the College prompts viewers of the videos to donate to support its work.  (*Id.* ¶ 47.)  Second, the College sells materials in connection with the videos, including recordings of the videos and books related to them.  (*Id.* ¶ 45.)  Third, the College operates a paid online distance learning program, for which the free videos serve as a form of promotion.  (*See id.* ¶ 46.)  Finally, the College uses the data from the Meta Pixel to better promote its videos, its distance learning program, and its in-person campus, as well to encourage more sales and donations.  (*See id.* ¶ 39.)

Plaintiffs allege that they registered for accounts to watch videos on online.hillsdale.edu and that the College transmitted information about the videos they watched to Meta without their consent.  (*Id.* ¶¶ 3–5, 87, 102–119.)  They allege that the transmitted information included their Facebook IDs, which link to Facebook profiles containing their names.  (*Id.* ¶¶ 104, 113.)  They seek to represent a class of people who have "visited online.hillsdale.edu (including subdomains), viewed at least one video during the time that Trackers were active at that website, and have or have ever had a[] F[acebook ]ID."  (*Id.* ¶ 120.)

## II. LEGAL STANDARD

A complaint may be dismissed for failure to state a claim if it fails "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S.

41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The Court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). When considering a motion to dismiss under Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino*, 869 F.3d at 397.

### III. ANALYSIS

The VPPA, enacted in 1988, is designed to keep people's video viewing history private. S. Rep. No. 100–599, at 1 (1988). Congress passed it after the Supreme Court nomination hearings for Judge Robert H. Bork, during which a newspaper published a list of movies Bork had rented. *Id.* The VPPA creates a right of action against "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). There are exceptions for, among other things, when "the disclosure is incident to the ordinary course of business of the video tape service provider." *Id.* § 2710(b)(2)(E).

The College argues that the VPPA is inapplicable because (1) the College is not a video tape service provider; (2) Plaintiffs are not consumers of the College's videos; (3) the alleged

4

disclosures are not of personally identifiable information; (4) the College is not responsible for the alleged disclosures; and (5) the alleged disclosures are incident to the ordinary course of business. The Court will address each contention in turn.

### A. Video Tape Service Provider

A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." *Id.* § 2710(a)(4). The reference to "similar audio visual materials" is generally interpreted to cover online streaming of prerecorded videos. *See, e.g.*, *Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 553 (N.D. Ohio 2024). Accordingly, the College does not dispute that its website "deliver[s] . . . similar audio visual materials." Rather, it argues that the phrase "engaged in the business of" implies a profit motive and therefore does not apply to the free service it provides. Plaintiffs contend that "engaged in the business of" extends beyond for-profit activities, and even if not, the College makes money in various indirect ways from its videos.

There are three potential interpretations of "engaged in the business of." They are, from narrowest to broadest: (1) delivering videos to make a profit, (2) delivering videos to produce revenue, and (3) delivering videos as part of some endeavor, monetary or otherwise. The first interpretation is ruled out by the plain meaning of the phrase, because a business endeavor need not be for profit. The definitions of "business" in Black's Law Dictionary include "[e]mployment, occupation, profession, or commercial activity engaged in for gain *or livelihood*." *Business*, *Black's Law Dictionary* (5th ed. 1979) (emphasis added); *see also Business*, *Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/business ("a usually commercial or mercantile activity engaged in as a means of livelihood"). Even a nonprofit entity can support its "livelihood" with business. *See Krassick v. Archaeological Inst. of Am.*, No. 2:21-CV-180, 2022 WL 2071730, at *5 (W.D. Mich. June 9, 2022) (holding that a nonprofit was

"engaged in the business of selling" magazines); *United States v. Day*, 476 F.2d 562, 567 (6th Cir. 1973) (holding that to be "engage[d] in the business of . . . dealing in firearms" implies a "purpose of livelihood or profit"); *United States v. Hamilton*, 689 F.2d 1262, 1271 (6th Cir. 1982) (interpreting "engage in the business of importing . . . explosive materials" to include a "purpose of livelihood or profit").

Based on the above reasoning, the College would be "engaged in the business of" delivering videos if it makes money from video delivery, regardless of whether it makes a profit. And Plaintiff's allegations support the inference that the College makes money from its videos. The College operates an online store that sells books in connection with the video courses, as well as recordings of the classes themselves. The College also uses the videos to solicit donations. Although the videos themselves are free, they are sufficiently connected with the College's efforts to raise revenue to put the College in the business of delivering videos.

Furthermore, even if the College did not make money from the videos, the Court would interpret "engaged in the business of" to encompass enterprises that are not intended to produce revenue. Although "business" commonly connotes commercial activity, it can also refer simply to "[t]hat which habitually busies or occupies or engages the time, attention, labor, and effort of persons as a principal serious concern or interest." *Business*, *Black's Law Dictionary* (5th ed. 1979); *see also Business*, *Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/business ("a particular field of endeavor"); *Business*, *Oxford English Dictionary* (2012) ("action which occupies time and demands attention and effort; *esp.* serious occupation or work, as opposed to pleasure or recreation"). Thus, for example, the Supreme Court has described the judiciary as being "engaged in the business of interpreting statutes." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017).

This broader interpretation of "business" aligns with the view adopted by many district courts that whether a defendant is "engaged in the business of" delivering videos turns on whether "the defendant's product [is] not only . . . substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017); *see also Cantu v. Tapestry, Inc.*, 697 F. Supp. 3d 989, 993 (S.D. Cal. 2023) (describing *Vizio* as "[a] seminal opinion on this question"). In other words, the analysis focuses on the defendant's activities and products, rather than its specific business model. Thus, even if the College makes no money from its videos, it is still subject to the VPPA because it is substantially involved in the conveyance of video lectures, and its work is significantly tailored to the purpose of conveying those videos to an online audience.

Indeed, courts have frequently held that "video-hosting websites need not charge fees to viewers to qualify as video tape service providers under the VPPA." *Jackson v. Fandom, Inc.*, No. 22-CV-04423-JST, 2023 WL 4670285, at *3 (N.D. Cal. July 20, 2023); *see Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 487 (1st Cir. 2016) (applying VPPA to free news app); *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 156 (S.D.N.Y. 2023) (applying VPPA to free news website); *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *7 (N.D. Cal. Aug. 10, 2012) (applying VPPA to free video-streaming subscription); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1340 n.2 (N.D. Ga. 2022) (applying VPPA to free medical advice website). Furthermore, as discussed below, courts have often classified plaintiffs as "subscriber[s]" under the VPPA if they provide "valuable personal information" in order to watch free videos. *See, e.g., Salazar v. NBA*, 118 F.4th 533, 552–53 (2d Cir. 2024). If the College gains valuable information in exchange for providing access to free videos, then it is engaged in the business of delivering videos whether or not it directly makes money from them.

7

The Sixth Circuit's decisions in *Day* and *Hamilton* might be read to imply that "engaged in the business of" includes a monetary motive. *See Day*, 476 F.2d at 567 (holding that to be "engage[d] in the business of . . . dealing in firearms" implies a "purpose of livelihood or profit"); *Hamilton*, 689 F.2d at 1271 (applying *Day* to a statute prohibiting "engag[ing] in the business of importing . . . explosive materials"). However, both cases were about how many sales would be sufficient to qualify as business; neither case addressed a situation where someone delivered firearms or explosives for some non-monetary purpose. Moreover, in the statutes interpreted in *Day* and *Hamilton*, the phrase "engaged in the business of" was used to define what conduct is prohibited. It is plausible that having a profit motive can make a given course of conduct, like dealing in firearms, more condemnable. Here, by contrast, the phrase is used to define what type of entities are liable for engaging in the prohibited conduct. It is less plausible that an entity's motive for engaging in video delivery should affect its liability for disclosing people's video watching histories. *Cf. United States v. Skinner*, 25 F.3d 1314, 1318 (6th Cir. 1994) (noting that *Hamilton*'s interpretation of "engaged in the business of" does not automatically apply to other statutes with the same language). Similarly, Sixth Circuit case law interpreting the phrase "an unincorporated trade or business" in the Employee Retirement Income Security Act, *see Loc. No. 499, Bd. of Trs. of Shopmen's Pension Plan v. Art Iron, Inc.*, 117 F.4th 923, 931 (6th Cir. 2024); 29 U.S.C. § 1301(b)(1), is inapplicable here due to the distinct statutory contexts at issue.

The College also suggests a different reason why it is not engaged in the business of video delivery: its primary purpose is in-person education, and the video lectures are merely a side project. But nothing in the VPPA limits liability to entities that *primarily* distribute videos. Rather, "'video tape service provider' is defined broadly to include even those businesses that dabble in video rentals." *NBA*, 118 F.4th at 549; *see also* S. Rep. No. 100-599, at 12 (VPPA Senate

8

Committee Report) (recognizing that the VPPA would apply to "a department store that sells video tapes" along with other products); *Salazar v. Paramount Glob.*, 133 F.4th 642, 655 (6th Cir. 2025) (Bloomekatz, J., concurring and dissenting in part) ("[A] 'video tape service provider' need not be exclusively, or even primarily, engaged in the 'rental, sale, or delivery of prerecorded cassette tapes or similar audio visual materials.'"); *Cappello v. Walmart Inc.*, No. 18-CV-06678-RS, 2019 WL 11687705, at *1–2 (N.D. Cal. Apr. 5, 2019) (plaintiffs stated VPPA claim against Walmart because it sells DVDs in addition to other products).

The College also contends that its online lectures do not put it in the business of video delivery because they are essentially a form of marketing for its other products. Some courts have held that defendants are not video tape service providers because the videos they deliver are purely for marketing purposes. *See Carroll v. Gen. Mills, Inc.*, No. CV 23-1746 DSF (MRWX), 2023 WL 4361093, at *3 (C.D. Cal. June 26, 2023) (General Mills was not engaged in the business of delivering videos because the videos on its website were only intended to advertise its food products and increase its brand presence); *Cantu v. Tractor Supply Co.*, No. 23-CV-3027, 2024 WL 1601257, at *4 (C.D. Cal. Mar. 21, 2024) (tractor supply company that posted "inspirational" videos to raise "brand awareness" was not a video tape service provider); *Hernandez v. Container Store, Inc.*, No. 23-CV-5067, 2024 WL 72657, at *2 (C.D. Cal. Jan. 3, 2024) (hosting advertisements for own products does not make defendant a video tape service provider). But these cases do not imply that a defendant can never be a video tape service provider if its videos support its marketing efforts. Rather, they suggest that a defendant's business is usually not significantly tailored to the purpose of video delivery when the only videos they make are advertisements. And while the College's lectures function to some degree as advertisements, they are not *just* advertisements. The lectures have an educational purpose entirely independent of their

9

marketing function. This purpose is enough to establish that the College's work is significantly tailored to the production and delivery of videos. *Cf. Shapiro v. Peacock TV*, No. 23-CV-6345 (KMK), 2025 WL 968519, at \*6 (S.D.N.Y. Mar. 31, 2025) (VPPA applied where plaintiffs watched online trailer that served as advertisement for defendant's television shows).

In sum, Plaintiffs have sufficiently alleged that the College is engaged in the business of delivering online videos and is therefore a "video tape service provider" under the VPPA.

### B. Consumer

The College also argues that Plaintiffs are not "consumers" under the VPPA. The statute defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1). Plaintiffs contend that they are "subscriber[s]" because they signed up for a free account to watch the College's videos. The College argues to the contrary that a person is only a "subscriber" if they pay a fee for access or have a significant relationship with the video tape service provider. The College also argues that Plaintiffs did not respond to specific aspects of its argument on this point, and therefore have forfeited their opposition to the argument. But Plaintiffs sufficiently addressed the issue (*see* Resp. Br. 9–14, ECF No. 25), so the Court will consider the merits.

Although the Sixth Circuit has not weighed in on this issue, the four Courts of Appeals to do so have all settled on a broader definition of "subscriber" than the College advocates for. In *Ellis v. Cartoon Network, Inc.*, the Eleventh Circuit surveyed dictionary definitions and observed that "[a]lthough most definitions of 'subscribe' or 'subscriber' involve payment of some sort, not all do." 803 F.3d 1251, 1256. "For example, one dictionary defines 'subscriber' as 'one that favors, aids, or supports (as by money contribution, moral influence, [or] personal membership).'" *Id.* (alteration in original) (quoting *Subscriber*, *Webster's Third New International Dictionary* (3d ed. 1981)). Thus, the court held "that payment is not a necessary element of subscription," as

10

"[t]he term 'subscriber' is not preceded by the word 'paid' in § 2710(a)(1) of the VPPA, and there are numerous periodicals, newsletters, blogs, videos, and other services that a user can sign up for (i.e., subscribe to) and receive for free."  *Id.* at 1256.  Instead, the court held that "[s]ubscriptions involve some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to restricted content."  *Id.* (cleaned up).

Similarly, in *Yershov v. Gannett Satellite Information Network, Inc.*, the First Circuit held that, although some definitions of "subscribe" include monetary payment, the term has a broader meaning in the VPPA.  820 F.3d 482, 488 (1st Cir. 2016).  The court reasoned that Congress would have been aware of "the reasonably common retailing practice of introductory enticements," where "a customer . . . obtained several videos from a new commercial supplier at no charge, or with money back."  *Id.*  There is "no reason why Congress would have wanted different disclosure rules to apply to those transactions than to ones where a monetary payment is made."  *Id.*  Thus, the court held that downloading a free phone app and providing valuable personal information to the defendant made the plaintiff a "subscriber" under the VPPA.  *Id.* at 489.

In *NBA*, the Second Circuit agreed that "subscriber" encompasses relationships that do not involve the direct exchange of money.  118 F.4th at 552–53.  There, the plaintiff signed up for a newsletter that required him to provide his email address, IP address (which allowed the defendant to determine his physical location), and electronic cookies.  *Id.* at 552.  This information allowed the defendant "to directly reach out to [the plaintiff]" and "increased the [defendant]'s potential to urge [the plaintiff] to visit [its website] and watch videos on it."  *Id.*  Thus, the plaintiff was a "subscriber" because he provided "valuable personal information in exchange for access to [an] online newsletter."  *Id.* at 552–53.

Finally, in *Gardner v. Me-TV National Ltd. Partnership*, 132 F.4th 1022, 1024 (7th Cir. 2025), the Seventh Circuit held that the plaintiffs were "subscribers" because they signed up for free accounts that required them to provide their email address and ZIP code. The court "assume[d] that, as a matter of common usage, a 'subscriber' gives value in exchange for goods or services." *Gardner*, 132 F.4th at 1024. But it noted that "[i]n an Information Age, data can be worth more than money." Thus, "[i]f paying $1 a year . . . would produce a subscription, then providing $1 worth of information must do so too." *Id.*

Although the Court is not bound by these cases, it is persuaded that they accurately capture the meaning of the word "subscriber" as used in the VPPA. A free account on a website can create enough of a relationship between the user and the operator of the website to qualify as a subscription. And even if subscriptions require an exchange of consideration, that requirement is satisfied by the personal information that users provide to make a free account.

Applying this definition, Plaintiffs have sufficiently alleged that they are subscribers to the College's online videos. Most videos cannot be accessed unless a user creates an account, which requires entering a full name and email address. And when users watch videos, the College learns even more information about them through the Meta Pixel. Presumably this information has value to the College, or it would not ask for it. *Cf. Yershov*, 820 F.3d at 489 ("Why, after all, did [the defendant] develop and seek to induce downloading of the App?") Although this information is less than was provided in *Yershov* and *NBA*—the College does not receive users' location data—it still "increase[s] the [College]'s potential to urge [Plaintiffs] to visit [its website] and watch videos on it." *NBA*, 118 F.4th at 552. Of the factors listed in *Ellis* as indicative of a subscription, Plaintiffs here have registered for an account, received delivery of videos, expressed an association with the College, and gained access to restricted content. The last factor in particular is often

12

viewed as significant by courts. *See, e.g.*, *Golden*, 688 F. Supp. 3d at 166 (plaintiff was not a subscriber because she "[did] not allege that [she] had to download the app to access on-demand video content or that doing so gave [her] any enhanced access to such content"); *Salazar v. Paramount Glob.*, 683 F. Supp. 3d 727, 742 (M.D. Tenn. 2023) (plaintiff was not a subscriber where he "did not allege that the video content . . . was available only through subscription to the newsletter"); *Alex v. NFL Enters. LLC*, No. 1:22-CV-09239 (ALC), 2023 WL 6294260, at \*4 (S.D.N.Y. Sept. 27, 2023) (plaintiffs were not subscribers where they "did not gain access to exclusive content or receive extra benefits through their subscription").

In sum, because accessing the College's videos required creating an account and providing valuable personal information to the College, Plaintiffs qualify as "subscriber[s]" to the College's videos and thus are "consumers" under the VPPA.

### C. Personally Identifiable Information

The College also contends that the information it allegedly provided to Meta was not "personally identifiable information" ("PII"). *See* 18 U.S.C. § 2710(b)(1). According to the VPPA, "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." *Id.* § 2710(a)(3). Plaintiffs allege that the Meta Pixel transmitted (1) the URL of the page visited, which includes the title of the video, and (2) the user's Facebook ID, which anyone can enter into facebook.com to find the user's Facebook page. The College argues that PII includes only information that an ordinary person could use to identify the user's identity. And it contends that the information transmitted by the Meta Pixel is not PII because an ordinary person would not be able to figure out the video title from the URL, and would not be able to figure out a person's identity from their Facebook ID.

13

Generally, "courts . . . agree that PII includes more than just information that, on its face, shows that a particular individual obtained a particular video." *Manza v. Pesi, Inc.*, 784 F. Supp. 3d 1110, 1118 (W.D. Wis. 2025) (collecting cases). "The courts reason that the inclusion of the suffix 'able' in 'personally identifiable information' implies that the information can be used to identify a person, not just that it identifies a person on its own." *Id.* Otherwise, the statute would not bar disclosure of "[p]hysical addresses, phone numbers, and Social Security numbers[, which] do not identify a person on their face, but . . . can be used to identify the person." *Id.*

However, courts have diverged on what it means for information to be personally identifiable. The Third Circuit has held that PII is information that "would readily permit an ordinary person to identify a specific individual's video-watching behavior." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 267 (3d Cir. 2016). Applying that standard, the court held that "static digital identifiers," which allowed the recipient of the information (Google) to track the same person's computer use across different contexts, were not PII because they would not allow an ordinary person to determine the user's identity. *Id.* at 282. The Courts of Appeal for the Second and Ninth Circuits have adopted the same standard. *See Solomon v. Flipps Media, Inc.*, 136 F.4th 41, 51–53 (2d Cir. 2025); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017). The First Circuit, on the other hand, has held that PII is "information reasonably and foreseeably likely to reveal which . . . videos [the plaintiff] has obtained." *Yershov*, 820 F.3d at 486. Thus, the court held that GPS coordinates were PII because most people can easily enter GPS coordinates into a map, and because the company to which the coordinates were disclosed could "link the GPS address and device identifier information to a certain person by name, address, phone number, and more." *Id.*

14

Although the Sixth Circuit has not articulated a specific definition of PII, it has observed that "the [statutory] definition of 'personally identifiable information' merely provides an *example* of what information a 'video tape service provider' can't disclose to others," and "it's not clear that 'personally identifiable information' always has to 'identif[y] a person as having requested or obtained specific video materials or services.'" *Paramount*, 133 F.4th at 652 (alteration in original) (emphasis added) (quoting 18 U.S.C § 2710(a)(3)). In *Paramount*, the court explicitly rejected the Second and Seventh Circuit's interpretation of PII and opted for a broader reading. *See id.* at 651-62. As the Sixth Circuit explained, "[i]t's far from the most natural reading to see the term 'personally identifiable information' as limiting." *Id.* While the interpretive question in *Paramount* was unrelated to the ordinary person standard, the case does indicate that the Sixth Circuit understands PII as an expansive term. *See Haines v. Cengage Learning, Inc.*, No. 1:24-CV-710, 2025 WL 2045644, at *3 (S.D. Ohio July 22, 2025) (applying *Paramount*'s reasoning to conclude a Facebook ID is PII).

Moreover, the Court agrees with the persuasive reasoning of the district court in *Manza*, which rejected application of the ordinary person standard. 784 F. Supp. 3d at 1116–23. As that court observed, "[t]he courts that have adopted the 'ordinary person' standard have identified little textual basis for the limitation they impose." *Id.* at 1119. Courts have justified the ordinary person standard based on the fact that the VPPA only prohibits "knowing[] disclos[ure]," which frames "disclosure from the perspective of the disclosing party." *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017). But "[t]he intent element places a limitation on when a video tape service provider can be held liable for disclosing PII; the element does not explain what PII is." *Manza,* 784 F. Supp. 3d at 1119. Moreover, if (as here) the defendant knows that the recipient of the disclosure can readily use the information to determine a user's identity, the knowledge

15

requirement is satisfied regardless of whether the ordinary person standard is met. The VPPA's "purpose is not served by allowing video tape service providers and third parties to knowingly evade the statute by disclosing a customer's identity with a number unknown to the 'ordinary person' but known by the recipient." *Id.* at 1122. Thus, "[c]ourts across the country . . . have indicated that providing a third party with PII that is legible to that specific third party is sufficient to state a claim under the VPPA." *Aldana v. GameStop, Inc.*, No. 22-CV-7063-LTS, 2024 WL 708589, at *8 (S.D.N.Y. Feb. 21, 2024).

Furthermore, even if the Court adopted the "ordinary person" standard, the information disclosed by the College would qualify as PII. As to the URL, the Court disagrees with the College's assertion that an ordinary person cannot obtain the name of the video from a web address. Plaintiffs provide this example of a URL transmitted by the Meta Pixel:

https://www.facebook.com/privacy_sandbox/pixel/register/trigger/?id=711322226445334&ev=PageView&dl=https%3A%2F%2Fonline.hillsdale.edu%2Fcourses%2Fpromo%2Ftotalitarian-novels&rl=&if=false&ts=1740630825595&sw=1920&sh=1080&v=2.9.184&r=stable&a=tmSimo-GTM-WebTemplate&ec=3&o=12318&fbp=fb.1.1738956026667.341932906172499229&cs_est=true&ler=empty&cdl=API_unavailable&it=1740630705273&coo=false&tm=1&rqm=FGET

Contrary to the College's assertion, an ordinary person is entirely capable of finding the words "totalitarian-novels"—the name of a Hillsdale online course—in this URL. The College cites *Solomon*, 136 F.4th at 54, where the Second Circuit held that an ordinary person could not decipher a URL from a similar string of characters. But that case does not bind this Court, and the factual inferences made there by the Second Circuit are simply unpersuasive.

As to the Facebook ID itself, Plaintiffs allege that anyone can simply type a Facebook ID into a web browser and find the Facebook profile—and thus the real name—of the person associated with that ID. These allegations are sufficient to show that an ordinary person can use a Facebook ID to discover a user's identity. Indeed, courts have frequently held that a Facebook ID

16

constitutes PII. *See In re Hulu Priv. Litig.*, No. C 11–03764 LB, 2014 WL 1724344, at \*14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user."); *Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314 (D. Mass. 2022) ("A Facebook ID is a unique identifier that allows anyone to discover the user's identity."); *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at \*3 (S.D.N.Y. Nov. 17, 2022); *Lebakken*, 640 F. Supp. 3d at 1342.

The College also argues that the Facebook ID is not PII because it is surrounded by other data. The Plaintiffs provide this example in their complaint, with the ID itself redacted:



(Compl. ¶ 69.) The College contends that an ordinary person would not be able to find the Facebook ID by glancing at this page. But even if the Court were to adopt the ordinary person standard as to the *type* of information, there is no reason to apply it to the *format* of the information. For example, a defendant cannot escape VPPA liability by simply sending the information in encrypted form, even though no bystander would be able to identify a video title just by looking.

*See In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1096 (N.D. Cal. 2015) ("No one would deny that I would violate the VPPA by passing someone an encrypted list of [a person]'s video rentals—if my recipient and I both understood that we would use a mutually intelligible code."). The VPPA is not primarily aimed at bystanders who might intercept a disclosure; rather, it is meant to prevent an *intended recipient* from receiving a disclosure. The information in the screenshot above is plainly sufficient for Meta to determine a person's Facebook ID, or else Meta would arrange for the Pixel to transmit the information in some other form.

The College makes two additional arguments as to why its alleged disclosures do not involve PII, but neither is availing. First, the College argues that its website only transmits a user's Facebook ID if the user has Facebook open in another browser tab. (Br. in Supp. 30, ECF No. 10.) The College is correct that the VPPA would only create liability in the instances where users' Facebook IDs were actually disclosed. However, Plaintiffs allege that data from Meta indicates the College shared their viewing histories in combination with their Facebook IDs. (Compl. ¶ 87.) The fact that the College does not *always* disclose people's Facebook IDs may be relevant when determining the size of the proposed class, but it has no bearing on the claims of the named Plaintiffs.

Second, the College argues that the example provided by Plaintiffs in their complaint only indicates the *course* that Plaintiffs visited (Totalitarian Novels), not the specific videos within the course that Plaintiffs watched. But Plaintiffs' allegations support the inference that when they selected particular videos to watch, those URLs would also have been sent to Meta. The College also points out that a user can access the webpages for the individual videos without actually playing the videos on those pages, so Meta will not necessarily know if Plaintiffs have watched particular videos. But the fact that a user clicked on the page for an individual video is enough to

18

indicate they "hav[e] requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Otherwise, a DVD store would not be liable for disclosing a list of DVDs rented because there is no way to know if the person actually *watched* them.

In sum, Plaintiffs have sufficiently alleged that the College disclosed their personally identifiable information to Facebook.

### D. Responsibility for Disclosure

The College also contends that it did not "disclose[]" Plaintiffs' information, 18 U.S.C. § 2710(b)(1), because Plaintiffs themselves were responsible for the disclosures. Specifically, the College argues that—based on Plaintiffs' allegations—the Facebook IDs are automatically sent to Meta without being accessed by the College. Furthermore, the College claims that Plaintiffs agreed to allow Meta to track their data on other websites when they signed up for Facebook and allowed it to use cookies. Therefore, in the College's telling, Plaintiffs caused their own data to be disclosed and the College bears no responsibility.

However, the College provides no basis in statutory text or purpose for the idea that "disclose" does not include automated activities. As alleged, the College knowingly installed code on its website that causes Plaintiffs' personal information to be sent to Meta. This conduct sufficiently establishes the College's responsibility for the transmission of that data. And though Plaintiffs signed up for Facebook accounts, the College does not argue that the agreements Plaintiffs signed with Meta were sufficient to create consent under the VPPA. *See* 18 U.S.C. § 2710(2)(B) (imposing various requirements for consent by consumers, including that "the video tape service provider [must] provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election").

19

The College cites *Mollett v. Netflix, Inc.*, 795 F.3d 1062 (9th Cir. 2015), in support of its position, but that case is distinguishable. In *Mollett*, the plaintiffs argued that Netflix violated the VPPA because the company provided users' personal information to the users themselves, who could then let third parties access their accounts and see that information. *Id.* at 1066–67. The court rejected this argument, reasoning that the users were responsible for the disclosures to third parties because they had control over who could see their information. *Id.* There is a significant difference between Netflix's choice to allow users to provide their information to others, and the College's alleged choice to automatically transmit users' information to a third party. In *Mollett*, the plaintiffs were ultimately responsible for the disclosures; here, the College is responsible.

In sum, Plaintiffs have sufficiently alleged that the College disclosed their PII to Meta.

**E. Ordinary Course of Business**

An exception to the VPPA allows disclosure of PII "to any person if the disclosure is incident to the ordinary course of business of the video tape service provider." 18 U.S.C. § 2710(b)(2)(E). "[T]he term 'ordinary course of business' means only debt collection activities, order fulfillment, request processing, and the transfer of ownership." *Id.* § 2710(a)(2). The College argues that its use of the Meta Pixel does not violate the VPPA because it is related to "order fulfillment" or "request processing."

Based on the allegations in the complaint, the Court is not persuaded that the College's disclosure of data to Meta is part of the ordinary course of business. Plaintiffs allege that the College discloses the data because, among other things, it helps the College better advertise itself on Facebook. But "[t]he term 'ordinary course of business' is 'narrowly defined' in the statute," *Daniel v. Cantrell*, 375 F.3d 377, 382 (6th Cir. 2004) (quoting S. Rep. No. 100–599, at 14), and Facebook advertising does not meet the plain meaning of "order fulfillment" or "request processing."

20

In support of its position, the College points to *Daniel*, where the Sixth Circuit noted that "'[o]rder fulfillment' and 'request processing' are defined in the legislative history as the use, by [video tape service providers], of 'mailing houses, warehouses, computer services, and similar companies for marketing to their customers.'" 375 F.3d at 382 (quoting S. Rep. No. 100–599, at 14). But the disclosure at issue in *Daniel* was to law enforcement, not for marketing purposes, so the Sixth Circuit had no occasion to examine this definition in any depth. The phrase "marketing to their customers" appears to refer to specific types of marketing that are not at issue here, as advertising on Facebook is simply not a plausible form of "order fulfillment" or "request processing." Furthermore, the VPPA has a separate exception, inapplicable here, for when companies use their customers' information for marketing purposes. *See* 18 U.S.C. § 2710(b)(2)(D)(ii). "If Congress intended to include 'marketing' in Subsection (E) where it discussed the 'ordinary course of business,' then it would have done so, and perhaps would not have also addressed 'marketing' in its own subsection." *Collins*, 720 F. Supp. 3d at 554–55.

Indeed, courts have frequently held that a company's disclosure of information for marketing or advertising purposes does not fall under the "ordinary course of business" exception. *See id.* at 556; *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) ("The alleged uses of the information here – 'marketing, advertising, and analytics' – do not fall within the exception's narrow list of permissible uses."); *Louth v. NFL Enters. LLC*, No. 1:21-CV-00405-MSM-PAS, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (disclosing PII "to measure analytics and increase advertising revenue" is not within ordinary business exception); *Markels v. AARP*, 689 F. Supp. 3d 722, 729 (N.D. Cal. 2023); *Jackson v. Fandom, Inc.*, No. 22-CV-04423-JST, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023); *Ade v. Viki, Inc.*, No. 23-CV-02161-RFL, 2024 WL 1880153, at *3 (N.D. Cal. Mar. 28, 2024).

In sum, the College's disclosure of Plaintiffs' information was not incident to the ordinary course of business.

### IV. CONCLUSION

For the reasons explained above, Plaintiffs' complaint states a claim against the College under the VPPA.  Accordingly, the Court will deny the motion to dismiss.

An order will issue consistent with this Opinion.

Dated: October 17, 2025

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE